TALKIN, MUCCIGROSSO & ROBERTS, L.L.P.

ATTORNEYS AT LAW
40 EXCHANGE PLACE
18TH FLOOR
NEW YORK, NEW YORK 10005

(212) 482-0007 PHONE
(212) 482-1303 FAX
WWW.TALKINLAW.COM
EMAIL: INFO@TALKINLAW.COM

MARYLAND OFFICE:
5100 DORSEY HALL DRIVE
SUITE 100
ELLICOTT CITY, MD 21042
410-964-0300

NEW JERSEY OFFICE:
79 MAIN STREET
SUITE ONE
HACKENSACK, NJ 07601
201-342-6665

December 29, 2020

Honorable Colleen McMahon
Chief United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

BY ECF

                Re:    United States v. James Cahill
                          20 Cr. 521 (CM)

Dear Judge McMahon:

        Defendant James Cahill ("Cahill") respectfully submits this letter as a brief reply to the government response (DE 71) to his Motion to Modify Conditions of Release (DE 70). In his motion, Cahill requested only that the home detention condition be changed to a curfew to be set by Pretrial Services ("Pretrial"). Pretrial, after having the benefit of intensively monitoring Cahill for nearly three months, consented to the modification application. The government's opposition to this application is misplaced and makes little attempt to actually address the standard that the defendant should be released "subject to the least restrictive further condition, or combination of conditions, that . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). The government does not argue that Cahill, a 71-year-old man with deep ties to the community, will flee or otherwise not appear in Court. And the government's only argument that Cahill is a threat to the safety of the community is premised on baseless alleged connections to organized crime. Additionally, the alleged "safety to the community" issues are addressed by a curfew with the same efficacy as the overly restrictive home detention condition.

        The government's only ascertainable articulation of why home detention is necessary is that "Cahill has deep ties to leading members of organized crime who are known to engage in acts of violence and intimidation which poses a threat to potential witnesses in this case, especially where Cahill [is] able to go anywhere and meet anyone without any real ability by Pretrial Services to monitor his movements." DE 71, p.5. We will briefly address why each of the three portions of this

contention—Cahill's "deep ties to organized crime," the potential to intimidate witnesses, and the lack of monitoring— is wrong. First, the last portion of this assertion, that Cahill could travel unmonitored should home detention be waived is demonstrably incorrect. Because Cahill consents to the continuation of GPS monitoring, not only is Pretrial in position to monitor his every movement, but these movements can also be documented. As noted, Pretrial agrees that such monitoring would be sufficient.

Second, the unfounded contention that Cahill would somehow attempt to intimidate a witness is equally unavailing. The government offers nothing more than the generalization that since Cahill knows people with alleged organized crime ties, he is inclined to engage in witness intimidation. This baseless allegation, however, is directly contradicted by Cahill's actions since his release on bond. Even though the identity of the confidential source ("CS") is, by virtue of the nature of the government's investigation in this case, necessarily known to Cahill, the CS has not been intimidated or even contacted. Instead, Cahill has been fully compliant with all conditions of his release, including not contacting anyone involved in the case. Cahill's motivation for the curfew request is to increase his ability to care for his wife and to have the ability to participate in the lives of his children and grandchildren as he advances in age. Risking those important concerns by engaging in the conduct suggested by the government is simply not in Cahill's best interest.

The government also fails to articulate to the Court how the more restrictive home detention condition prevents the improper contacts they surmise will occur in ways that a curfew and GPS monitoring would not. Preventing in-person meetings outside his home does not prevent contact. Were Cahill inclined to violate his conditions of bail, which he is not, there are myriad confidential and coded methods of communication available to anyone in this era of advanced technology. More traditional avenues such as telephone conversations or in-person meetings at his home could be similarly be used. Home detention does not serve to prevent any the above described contacts. However, none have occurred because Cahill has and will continue to abide by the fundamental condition that he abide the law, which satisfactorily addresses any perceived concerns for safety. Cahill wishes only to pursue a healthy lifestyle with his loved ones. The home confinement condition of release is far more excessive than that necessary to "reasonably . . . assure … the safety of any other person and the community," as contemplated by the bail statute. 18 USC § 3142(c).

Third, in an attempt to support its unfounded claim that Cahill has "deep ties" to organized crime, the government cites statements regarding the "Westies" and John Gotti. The Westies have been nonexistent for three decades and John Gotti has been deceased for two. The government also attempts to connect defendant to organized crime through one of his brothers and his brother in-law, deceased nine and eight years, respectively. Despite the efforts by the government to sensationalize these ancient references by Cahill, they were nothing more than stories, cherry picked from over fifty hours of recorded conversations, that included significant amounts of creative license and were regaled during long meals where, as the audio and video recording clearly establish, copious amounts of alcohol were consumed by all attendees, including the CS. The insignificance of these spun stories is demonstrated by their inconsistency. For

Page 3
December 29, 2020

example, the government first refers first to a story told by Cahill about a friendship with a figure named Michael Michael as proof of close ties to organized crime and then shortly thereafter cites as proof for the same proposition another story where Cahill asked a second person involved in organized crime to talk Michael Michael out of bothering Cahill's nephew. Importantly, the government does provide a single example where Cahill was involved in or threatened any violent act. Nor do they provide any proof to support the logical leap that knowing either of these individuals will result in any threat of witnesses in the instant case.

Finally, although the government does not directly claim that Cahill is a risk of flight, it dedicates a large portion of its letter to the allegations in this case. Many of these allegations are heavily contested and we believe are unsupported by, or will be disproven, by the evidence. As one example, the government's letter asserts that Cahill "explicitly directed CS not to become a union member," in support of which the government drew the Court's attention to a single comment made by Cahill during an October 21, 2019 conversation about CS's business being hassled if he joins a union. DE 71, p.4. The government failed, however, to direct the Court's attention to many instances during the multiple meetings preceding the October 19, 2010 discussion, where Cahill and others asked CS to join and explained the benefits of joining the union and explored various methods by which CS could provide work, pay and benefits for union members. A few examples of these discussions include:

> (1) During a conversation nearly a year prior, on October 22, 2018, Cahill told CS, I think there is slot ... to be back in the fold. How long were you signed with the [local union]?";
> (2) On November 24, 2018, Cahill told another union official that to resolve CS's business issues, "my suggestion to you is sign him [CS] up [as a union contractor];
> (3) When CS was asked if he would sign with Local 638 during a March 19, 2019 meeting, he said, "I will sign with you forever.... Once I sign with you guys, and we do that, we can bring to you [sic] business"; and
> (4) On April 19, 2019, when CS complained that a prior debt he owes to Local 200 for failure to pay union benefits to workers is keeping him from signing a union agreement, Cahill said, "That will change once you sign into your first job agreement [with Local 638]" and that if CS gets a job he can "sign one line agreements with 638," thereby giving union members work hours they otherwise would not have had.

Cahill understands that this motion is not the proper forum for litigating trial issues, but these facts are presented to the Court in order to provider a fuller and more accurate view of the evidence and rebut the government's stilted argument in its letter.

Page 4
December 29, 2020

      For the above-stated reasons and those set forth in his Motion to Modify, Cahill respectfully submits that replacing the home detention condition with a curfew is reasonable and will result in his bond being subject to the "least restrictive" combination of conditions that will assure his appearance in court and the safety of the community as contemplated in 18 U.S.C §(C)(1)(b). Thank you for Your Honor's consideration of this application.

                              Very truly yours,

                              *Sanford Talkin*
                              Sanford Talkin

cc:    AUSA Jason Swergold (by ECF)
        All Counsel (by ECF)