LB9BCAHC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

             v.                          20 Cr. 521 (CM)

JAMES CAHILL, et al,


                 Defendants.
                                         Teleconference
------------------------------x
                                         New York, N.Y.
                                         November 9, 2021
                                         3:00 p.m.


Before:

              HON. COLLEEN MCMAHON,

                                         Chief Judge

                    APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  JASON M. SWERGOLD
     JUN XIANG
     DANIELLE SASSOON
     LAURA DE OLIVEIRA
     Assistant United States Attorneys


SANFORD N. TALKIN
     Attorney for Defendant James Cahill

EDWARD V. SAPONE
     Attorney for Defendant Christopher Kraft

ALBERT EBANKS
     Attorney for Defendant Patrick Hill
```

(Appearances Continued)

JAMES R. FROCCARO
    Attorney for Defendant Matthew Norton

BRIAN E. MAAS
    Attorneys for Defendant William Brian Wangerman

CAMILLE M. ABATE
    Attorney for Defendant Kevin McCarron

HENRY E. MAZUREK
ILANA HARAMATI
    Attorney for Defendant Jeremy Sheeran

STEVE ZISSOU
    Attorney for Defendant Andrew McKeon

ROLAND G. RIOPELLE
    Attorney for Defendant Robert Egan

GLENN H. MORAK
    Attorney for Defendant Scott Roche

JOHN F. KALEY
    Attorney for Defendant Arthur Gipson

1              (Case called)
2              DEPUTY CLERK:  Counsel, first I'll call the
3     defendant's name.  Counsel, state your client's name and say if
4     your client is here.
5              James Cahill.
6              MR. TALKIN:  Good afternoon, your Honor.
7              Sanford Talkin for Mr. Cahill.  Mr. Cahill is present
8     with me in my office.
9              DEPUTY CLERK:  Speak up, folks.
10             Kraft
11             MR. SAPONE:  Good afternoon, your Honor.
12             Edward Sapone for Mr. Kraft, and Mr. Kraft is on
13    video.
14             DEPUTY CLERK:  Hill.
15             MR. EBANKS:  Good afternoon, your Honor.
16             Albert Ebanks on behalf of Patrick Hill.  My client is
17    on via phone call.
18             DEPUTY CLERK:  Norton.
19             MR. FROCCARO:  Good afternoon, your Honor.
20             James Froccaro for Mr. Norton, who is seated beside
21    me, your Honor.
22             DEPUTY CLERK:  Wangerman.
23             MR. MAAS:  Good afternoon, your Honor.
24             Brian Maas for Mr. Wangerman.  Mr. Wangerman is seated
25    next to me.

1            DEPUTY CLERK:  McCarron.

2            MS. ABATE:  Good afternoon, your Honor.

3            Camille Abate for Kevin McCarron who is on via

4    telephone.

5            DEPUTY CLERK:  Sheeran.

6            MR. MAZUREK:  Good afternoon, everyone.

7            Henry Mazurek, Ilana Haramati on behalf of

8    Mr. Sheeran, who is sitting between us on video.

9            DEPUTY CLERK:  McKeon.

10           MR. ZISSOU:  Steve Zissou for Mr. McKeon.  He is

11   present with me in my office.

12           Good afternoon, your Honor.

13           DEPUTY CLERK:  Eagan.

14           MR. RIOPELLE:  Good afternoon, your Honor.

15           Roland Riopelle for Robert Egan who is here at my

16   office with me.

17           DEPUTY CLERK:  Roche.

18           MR. MORAK:  Good afternoon, your Honor.

19           This is Glenn Morak.  Mr. Roche appears on Teams

20   presently.

21           DEPUTY CLERK:  Gipson.

22           MR. KALEY:  Good afternoon, your Honor.

23           John Kaley for Mr. Gipson who is appearing by

24   telephone.

25           DEPUTY CLERK:  Government.

1  MR. SWERGOLD:  Good afternoon, your Honor.
2  For the government, Jason Swergold, Jun Xiang,
3  Danielle Sassoon and Laura De Oliveira.
4  DEPUTY CLERK:  Again, I'm reminding everybody to
5  please speak up.
6  THE COURT:  I have a consent to proceed in this
7  manner, which is by videoconference or teleconference, from
8  Patrick Hill.  I have one from Mr. Eagan.  I have one from
9  Mr. McCarron, one from Mr. Cahill, one from Mr. Kraft, one from
10 Mr. Gipson, one from Mr. Norton.  That's seven.  That means I
11 don't have them from some people.
12 MR. MAZUREK:  This is Henry Mazurek on behalf of
13 Mr. Sheeran.  We needed to get my client's signature, but we
14 consent.
15 THE COURT:  Mr. Mazurek, you're breaking up.  You want
16 to say that again.
17 MR. MAZUREK:  Yes, your Honor. Henry Mazurek on behalf
18 of Mr. Sheeran.  One should be delivered shortly by email.  We
19 just had to get his signature when he arrived.  My assistant
20 should be emailing that shortly.  We agree orally to proceed by
21 video.
22 MR. MAAS:  Your Honor, this is Brian Maas for
23 Mr. Wangerman.  I'll have Mr. Wangerman sign the form and get
24 it back to you, but we certainly consent.
25 MR. MORAK:  Your Honor, this Glenn Morak for

1  Mr. Roche. I emailed the form at 8:30 this morning to
2  Mr. O'Neil.
3      MR. SAPONE: Your Honor, this is Ed Sapone on behalf
4  of Mr. Kraft. I got his signature and e-mailed it yesterday.
5      THE COURT: We have Mr. Kraft. All right. This is
6  the last time we're doing this, folks. I just want people to
7  know. We're going back to normal. We're going back to people
8  appearing in court. I have no idea how much longer this CARES
9  Act stuff is going to be continued, but I'm done. I'm done.
10 I've been here all day. You all can come in.
11     From the government, Mr. Swergold, what are we doing?
12     MR. SWERGOLD: Thank you, your Honor.
13     To give the Court an update in terms of discovery and
14 then recent conversations and agreements that we've reached
15 with defense counsel regarding discovery issues: Since the
16 last conference, the government made additional productions
17 that included line sheets for the three wiretaps that we
18 produced, additional responsiveness review sets for electronic
19 devices.
20     We had previously cross-produced the full devices to
21 everybody, except for Mr. Sheeran because he had not signed
22 that cross-production agreement, but now we also continue to
23 follow up with productions of the responsive sets. And then
24 the largest item is obviously as we previewed in the June 17th
25 conference, the consensual wiretap that was approximately two

1    years on the confidential source's phone.  All of that's been
2    produced.  We think we've produced all the categories of Rule
3    16 information of which we are aware.  We obviously continue to
4    go through our files, either in response to the defense
5    requests or just on our own to make sure that there's no
6    one-off documents that we haven't produced.
7               There were some issues with some of our productions
8    because of the size of the production or a technical issue
9    where defense counsel helpfully brought to our attention that a
10   piece of the production appeared to be missing.  We continue to
11   fix those issues.  So while we may have still have additional
12   hard drives to burn, it's because we're fixing something that
13   we previously produced to the defense.
14              We had a meet and confer with the defense, with the
15   majority of defense counsel last week.  The government
16   appreciates and recognizes that there is a very high volume of
17   material in this case, that there are wiretaps that span in
18   some -- with respect to some of the phone over a year, which is
19   a long time to have a wiretap to review.
20              And we also recognize that the wiretap program is not
21   something that's necessarily very user friendly, and it's not
22   one that defense counsel in this district I think are
23   accustomed to using, and we've committed from the beginning to
24   provide as much technical support to the defense as needed.  We
25   had multiple conversations with defense counsel to help them

1  work through those issues.  On the recent meet and confer, one
2  thing that defense counsel ask was whether or not the
3  government would be willing to produce to them, basically very
4  early case in chief material to help them sort of consider the
5  case and go through the voluminous wiretaps reports.
6           Obviously, that's a premature request because we don't
7  know what our case in chief is going to look like.  We don't
8  even know who is going to go to trial, but what we did commit
9  to do is on a rolling basis, we're going to produce to them or
10 identify for them what you could call hot docs or hot calls
11 both off the wiretap and in other categories of evidence to
12 allow the defense to have a better opportunity to assess the
13 strength of the evidence against their clients, hopefully to
14 facilitate some discussions to resolve the case with respect to
15 some of the defendant.  So we have agreed to do that, and we'll
16 start producing that stuff to the defendants on a rolling
17 basis.
18          They also asked us about certain information related
19 to some subpoenas that we had issued to third-parties in the
20 hopes of avoiding unnecessary Rule 17 litigation, and we
21 thought that it was prudent to provide them with the
22 information that they asked for, and so hopefully we will not
23 be burdening the Court with any Rule 17 litigation.
24          So from the government's perspective, your Honor, I
25 think it makes sense to set a motion schedule based on the

1  productions that have happened to date. In speaking with
2  defense counsel -- look, I don't think the government is saying
3  today that the Court needs to set a trial schedule if the
4  defense is saying that they need more time to review.
5      THE COURT: I can't set a trial schedule,
6  Mr. Swergold. We're not allowed to do that yet.
7      MR. SWERGOLD: Right. What we would ask for is a
8  motion schedule, and the hope really is, I think, that by
9  identifying these sets -- again, for the lack of a better term,
10 hot documents, hot calls, recordings, to the defense that we
11 can facilitate plea discussions in the near future.
12     THE COURT: It's remarkable how far ahead of your
13 mouth your voice is, Mr. Swergold. That is quite a speech.
14 Okay. What about from defense counsel?
15     MR. KALEY: This is John Kaley for Mr. Gibson. My
16 suggestion would be to not set a motion schedule, but to give
17 us additional time to review what really was voluminous
18 material that we received at the end of September.
19     At the end of September, the government produced the
20 actual audio files for the Suffolk County wiretap that had been
21 up for two years. We have calculated that there are
22 approximately 6,357 audio files. They are not searchable. We
23 don't know who's on what audio file, and the only way to do it
24 is to actually go through them one by one as far as I can tell.
25     So to the extent the government is going to preview

some of what they consider the hot calls, that would be helpful. And rather than spending time on motions that may or may not be necessary, I would prefer to spend time on these audio calls.

And in that regard, your Honor, I had asked the government to consider modifying the protective order, which precludes the defendants from having what has been designated as sensitive material in their possession. But quite honestly, there's no way that I can have Mr. Gipson sitting in my office with someone watching him while he attempts to listen to as many of these audio files as possible.

That's kind of an ancillary point to my suggestion that we adjourn and give us more time to listen to these calls and to review this material. Just parenthetically, the government has been helpful quite recently also with regard to the previous wires that were produced in February. Those contain probably 7- or 800 audio files.

We received the line sheets for those wires in September, and so it has been helpful to have line sheets. Otherwise, we were in the same predicament of just listening to a phone call and seeing who's there, but we don't have line sheets for the over 6,000 audio files that were just produced in September. And I appreciate that the government will make some effort to give us the hot stuff.

I'm hoping that while they're reviewing the hot stuff

1   and they come across some *Brady* material, they'll also turn

2   that over, but that's a herculean task.  It's over 6,000 audio

3   files.  Some of them may be short, just an answering machine, a

4   pick up, call me, that type of thing, but it would appear that

5   many of them are conversations.

6        THE COURT:  I'm confused as to why we're having all

7   these issues with the Suffolk wiretap. Mr. Swergold, you said

8   that the program was not one with which counsel in this

9   district are familiar. I don't understand that.

10       MR. SWERGOLD:  Your Honor, if I may, and then also I

11  just want to address a point that Mr. Kaley made to make sure

12  the record is clear.  The wiretap program is a program that the

13  Suffolk County District Attorney's office uses.  It creates

14  what you could call a packet of discovery material, so it will

15  have all of the information for each call, and it will have a

16  link for the audio, and you should be able to navigate through

17  it.  But what we found was, there were difficulties depending

18  on what programs different people were using to listen to it.

19       We did make recommendation to what programs people

20  should use on their computers.  That worked for some.  It

21  didn't work for others.  It's not the typical system that we

22  see, for example, like when the DEA -- when we produce a

23  wiretap from the DEA.  It's just not the same program that

24  Suffolk is using.  It's also not a program that we've used a

25  lot at the U.S. Attorney's office.  I have used it in other

1    cases when we inherited a case from the state.  We're trying
2    very hard to get it to work for everybody, and that's one of
3    the reasons why we've agreed to produce this early disclosure
4    of what we consider to be relevant calls.
5            I do want to point out -- so there are two parts to
6    the wiretap.  There's the wiretap on three targets that were --
7    you have a wiretap on three targets that was produced in
8    February, and then there's the wire on the confidential source
9    that was produced in September.
10           With respect to the September one, most of that is not
11   really Rule 16.  It's very, very, very early 3500/*Giglio*
12   disclosure, and there are no line sheets for that, because the
13   agents were not making line sheets.  It was a consensual
14   wiretap.  The line sheets that we did produce go to the
15   calls -- the three wires they had in February.  And just so the
16   Court knows, that's on Mr. Cahill, Mr. Gipson and Mr. Hill.
17           I was going to say with respect to Mr. Kaley's recent
18   request regarding the protective order, I advised him that was
19   something the government would discuss internally and get back
20   to him.  There is a concern obviously with relaxing protective
21   order restrictions on a wiretap that belonged to a confidential
22   informant, but we are going to consider it and figure out if
23   there's something we can do to help the defense with respect to
24   the review of that wiretap.
25           MR. RIOPELLE:  Roland Riopelle for Robert Eagan.  With

respect to the 6, 000 plus calls for which there are now no line sheets --

THE COURT: And never will be any line sheets.

MR. RIOPELLE: Is the government committing to go through those and include those in what it calls the hot documents that is apparently going to produce to us soon, or is that just going to be out there now for everybody to try to get through at some point in the future?

I want to know if those are going to be included in what's going to be produced to us as the hot documents for our respective clients?

MR. SWERGOLD: Yes, your Honor. We will include relevant calls off of that wiretap and include it in the hot documents.

And I would just note -- and I think all of the defense lawyers are aware of this -- that even though the program doesn't have the typical search capability that you would see in some of the other wiretap programs, the defendants can search -- there is a master PDF for each wiretap. The defendants can search, for example, for their client's phone numbers and pretty quickly identify calls that their clients were on.

I recognize that it then requires an additional one or two or three steps to listen to the call because of the functionality of the program and some of the limitations people

have been having, but that is, again, one of the things we've tried to help walk them through so that it's easier for them to review it rather than clicking on every single call.

THE COURT: This is all very kind, Mr. Swergold, but my question is: You produced this in September. Presumably you have some occasion to listen to and identify what the critical parts of it were before you produced it.

It's now November, when are the critical calls from your perspective going to be identified? Next week? Next month?

MR. SWERGOLD: We can start rolling out all the critical calls -- what we consider to be the critical calls off the wires, and the defense has agreed -- without limitation to identifying additional stuff as we move on. We can do it within 30 days, your Honor. This is a request that we received from the defense last week for the first time, and we are committed to working on it.

THE COURT: Mr. Swergold, please. You know what critical calls are. If I tell you, you have to give it to them tomorrow, you can do that. I know you know that.

MR. SWERGOLD: And we would respectfully request, your Honor, a little more time than producing it by the end of this week to get a large set as possible to the defense as possible.

THE COURT: Well, okay, I tell you what, you get it to them by the end of this month, which is the 30th of November.

1      MR. SWERGOLD: Understood.

2      THE COURT: I'm going to set a long motion schedule
3 that will accommodate everybody's interests, defense in
4 reviewing things and the government having a motion schedule.
5 I want to start moving this case. This case is going nowhere
6 fast on my calendar.

7      So defense motions by February 25; government's
8 response March 25th; defense reply April 8. Then we'll have a
9 religious holidays week.

10      Mr. O'Neil, I want to set the next conference for the
11 end of April, beginning of May.

12      MR. RIOPELLE: Your Honor, it's Roland Riopelle for
13 Robert Eagan. I have a firm trial day out of town first two
14 week of may. If I could appear by video, I'm happy to do that.
15 I don't want to hold the Court up, but I know your Honor is
16 very committed to in-person. I just want to tell you I'm going
17 to be out of town.

18      THE COURT: If it turns out that you're a couple of
19 thousand of miles away, we'll have to take you by video Mr
20 Riopelle. I'm going to be a couple of thousands of miles away
21 the 13th of May. It will be before that, and I will not be on
22 trial. Mr. Riopelle, what time zone are you going to be in?

23      MR. RIOPELLE: I'm going to be in Salt Late City, your
24 Honor.

25      THE COURT: In mountain time, so you're two hours

1  behind us. I don't have any idea what Salt Lake City trial day
2  is.
3              MR. RIOPELLE:  He tells us that he goes to about five.
4              THE COURT:  Which is seven here.  What time does he
5  start?
6              MR. RIOPELLE:  He wants us in the courtroom beginning
7  at 8:30 in the morning which is 10:30 New York time.
8              THE COURT:  Does he allow you to eat?
9              MR. RIOPELLE:  I hope.  I'm told that he does, your
10 Honor, and that lunch is at about noon.
11             THE COURT:  Which is two o'clock.  So let's say 2:15.
12             MR. RIOPELLE:  He's very accommodating, your Honor.
13 He'll work with you.
14             THE COURT:  Good.  I'm delighted.
15             MR. MAZUREK:  Your Honor, This is Henry Mazurek. I
16 have a request for indulgence from your Honor on the date of
17 February 25th.  We have another set of humungous motions due on
18 that same day. Would you extend --
19             THE COURT:  Extend it to when?
20             MR. MAZUREK:  Just to March 4th.
21             THE COURT:  Okay.
22             MR. MORAK:  Your Honor, This is Glenn Morak for Scott
23 Roche.  Is it possible to do May 3 instead of May 4th, because
24 I may be going out of town on May 4th?
25             THE COURT:  May 3rd, 2:15, 12:15 mountain.  Time

excluded to May 3rd in the interest of justice.  The defendants' interest in speedy trial being outweighed for the need of their lawyers to review what is apparently a very difficult wiretap to review with over 6, 000 discrete files and no line sheets and also to accommodate the making of motions.

If we get to the end of February, beginning of March, and nobody's making any motion -- I mean, I don't think that's going to happen, if we get there and nobody is not making any motion, will someone call Mr. O'Neil. Okay.

Otherwise, I'll see you next May.  I will see you in courtroom 24A one way or another, and we need to move this cause along, folks.  I'm hoping that by May I'll have the ability to give you a trial date.

We're moving toward that.  We're moving toward calendar control in individual judges.  I Actually want to thank the executive attorney's office and all defense counsel. You've been remarkably patient.  I know this has been hard on you.  It's hard on us too.  But I have to tell you, we have completed upwards of 80 jury trials in this district, and we are the only federal district in this country that has done anything like that, and it's because we've gone to this centralized schedule.

I don't want to be a state court judge anymore. I stopped doing that 23 years ago. I'd like to come back to being a federal judge and have control over my own calendar, and

1   hopefully that will happen in the first quarter of next year,
2   but we could have not done this without you so thank you.
3            Anything else from the government?
4            MR. SWERGOLD:  No.  Thank you, your Honor.
5            THE COURT:  Okay.  From the defense, anybody.
6            Have a wonderful holiday season.
7            (Adjourned)