USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/18/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

UNITED STATES OF AMERICA,

-against-

JAMES CAHILL, et al.,

Defendants.

---------------------------------------------------------------x

20 CR 521 (CM)

DECISION AND ORDER DENYING DEFENDANTS' PRETRIAL MOTIONS

McMahon, J.:

The Government filed a three-count indictment, 20 Cr. 521 (CM). Count One charges all defendants, except Roche and Gipson, with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). (Indictment ¶¶ 1-10). Count Two charges all defendants with conspiring to commit honest services fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 1349. (¶¶ 11-16). Count Three charges all defendants with conspiring to violate 29 U.S.C. § 186, also known as the Taft-Hartley Act. (Indictment ¶¶ 17-22).

Before the Court are the pretrial motions filed by defendants James Cahill, Robert Egan, Kevin McCarron, William Brian Wangerman, and Arthur Gipson:[1]

Background

This case arose out of law enforcement's investigation of a labor union bribery scheme with the assistance of a confidential informant referred to as Employer-1. According to the

[1] Defendant Patrick Hill had made a motion to dismiss the counts against him on entrapment grounds. (Dkt. 235, "Hill Mot."). Entrapment is an affirmative defense to be resolved at trial; not a basis on which to dismiss an indictment. The motion is nonetheless moot, as Hill has since pleaded guilty. Likewise, defendant Christopher Kraft's motion to join in his codefendants' motions and to strike certain phrases from the Indictment (Dkt. 236-37, "Kraft Mot."), are denied as moot—he too pleaded guilty after filing his motions.

Indictment:

Employer-1 is a non-union employer in the plumbing business. (Indictment ¶ 10). Since at least in or around October 2018, Employer-1 paid a series of bribes totaling over $100,000 to current and former officials of Local 638 of the Enterprise Association of Steamfitters ("Local 638") and Local Union 200 of the United Association of Journeyman and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada ("Local 200"). Local 638 and Local 200 have jurisdiction over plumbing and steam-fitting in New York City and Long Island. (Indictment ¶¶ 1, 3, 10, 12, 18).

The defendants in this case are eleven individuals whom Employer-1 bribed, including ten individuals who were current and former Local 638 officials at the time they accepted bribes and one individual (Arthur Gipson) who was a Local 200 official at the time he accepted bribes. (Indictment ¶¶ 5, 15, 18, 25). Although the defendants owed duties to their respective unions to ensure that contracts were awarded to employers who hired members of those unions, in exchange for Employer-1's bribes, they agreed, among other things, to: (i) "acquiesce[] in Employer-1's bidding and performing construction work with non-union labor for projects that would otherwise have potentially been awarded to companies whose employees were represented by Local 638 and/or Local 200"; and (ii) "allow[] Employer-1 to falsely hold himself out as using union labor to builders in order to obtain plumbing and steam-fitting subcontracts." (Indictment ¶¶ 4, 21).

Defendants' Motions to Dismiss the Indictment

Although defendants couch their various motions to dismiss the Indictment, in whole or in part, as legal sufficiency challenges, the motions are for the most part challenges to the factual sufficiency of the Indictment. As a general rule, such sufficiency of the evidence challenges "are not appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Alfonso*, 143. F.3d 772, 773 (2d Cir. 1998).

Federal Rule of Criminal Procedure 7 provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The Supreme Court has "identified two constitutional requirements for an indictment: first, that it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, that it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007). To meet that standard, the Second Circuit has made clear that an indictment needs to "do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Walsh*, 194 F.3d37, 44 (2d Cir. 1999).

On a "motion to dismiss, the Court's task is a narrow one—it is *not* concerned with whether the Government will have sufficient evidence to meet its burden of proof as to each element of the charged conspiracies at trial," but rather "is concerned solely with whether the nature of the alleged conduct, if proven, legally constitutes the crimes charged, and whether the defendant has had sufficient notice of the illegality of such conduct." *United States v. Ulbricht*, 31 F. Supp. 3d 540, 555 (S.D.N.Y. 2014) (Emphasis added). Further, "the Court accepts as true the allegations set forth in the charging instrument for purposes of determining the sufficiency of the charges." *Id.* at 549.

*Motion to Dismiss Charges Based on 29 U.S.C. § 186(a)(2)*

The defendants' first contention is that 29 U.S.C. § 186(a)(2) is inapplicable to them because Employer-1 was a non-union employer whose employees were not represented by the union at the time of the bribes. The Government argues that this, much like defendants' other contentions, is the type of sufficiency of the evidence argument that is not properly adjudicated prior to trial.

However, defendants' argument that § 186(a)(2) does not apply to the charged conduct is the one motion that is arguably ripe for resolution as a matter of law. There is no dispute as to what the evidence relevant to the claim will show at trial, and defendants have advanced a nonfrivolous—albeit flawed—challenge to the applicability of the statute to the charged conduct.

Section 186(b) of the Taft Hartley Act makes it illegal for the defendants "to request, demand, receive, or accept, or agree to receive or accept" certain categories of payments, including payments prohibited by §§ 186(a)(2) and (a)(4):

- Section 186(a)(2) prohibits payments from "any person . . . who acts in the interest of an employer . . . to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or *would admit to membership*, any of the employees of such employer who are employed in an industry affecting commerce." 29 U.S.C. § 186(a)(2) (emphasis added).

- Section 186(a)(4) prohibits payments from "any person . . . who acts in the interest of an employer . . . to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization." 29 U.S.C. § 186(a)(4).

29 U.S.C. § 186(b).

Defendants' argue that § 186(a)(2) requires that the employer who made the payments (Employer-1) have already hired employees represented by the defendants' unions at the time of the bribes. (Cahill Mot. 4-7; Egan Mot. 5-6; Gipson Mot. 7; Wangerman Mot. 5-7). But by its plain text, § 186(a)(2) imposes criminal liability if the defendants' unions "would admit to membership" any of Employer-1's employees. 29 U.S.C. § 186(a). As the Eleventh Circuit has explained, "[i]f the conditional verbiage of the 'would admit to membership' clause is to have any meaning, Congress must have intended § 186 to capture payments to union officials when the employer employs individuals who were not yet union members." *United States v. Browne*, 505 F.3d 1229, 1251 (11th Cir. 2007). Accordingly, by the statutes express terms, the

Government need not show that Employer-1 had "an existing employment relationship . . . with current union members—instead, it need only be the case that the [Employer-1] has an existing employment relationship with employees who *would be admitted* to [Local 638 or Local 200]," such as employees who work in the plumbing or steam-fitting industry. *Id.* (emphasis added).

In this case, the Government has pled that Employer-1 was an active employer in the plumbing or steam-fitting industry and had hired at least one employee in that industry at the time of the bribes. It will be required to show at trial the union would have admitted Employer-1's employees to membership.

The defendants' reliance on *United States v. Cody*, 722 F.2d 1052 (2d Cir 1983), is misplaced. They point the Court to the following quotation: "§ 186(a)(2) . . . requires an *existing* employment relationship, between the employer and members of the union, not the possibility of a future relationship," *id.* at 1058 (emphasis in original), and argue that, in this Circuit, *Cody* requires Employer-1 to have already employed members of Local 638 and/or Local 200 at the time of the bribes. (Cahill Mot. 5-6; Egan Mot. 5-6; Gipson Mot. 7-8; Wangerman Mot. 5-7). But defendants have to quote this passage out of context and misconstrue the Second Circuit's holding in order to make this argument. *See Browne*, 505 F.3d at 1250-51 (rejecting defendant's reliance on *Cody*'s "existing employment relationship" language as inconsistent with the plain text of § 186).

In *Cody*, union leader John Cody received the rent-free use of a luxury apartment from a general contractor. *Id.* at 1056. During the time Cody used the apartment, the general contractor not only "did not employ members of [Cody's union]," but it also *did not have any* "present employees" at all, using only "various subcontractors." *Id.* at 1057-59. The Second Circuit recognized that the "the statute was designed to protect the possible future unionization of present employees, not, as here, the possible future hiring of present union members." *Id.* at

1058-59 (emphasis in original). That is precisely what is alleged here: that Employer-1 bribed union officials while his existing employees, who could have been union members, were not members.

Acknowledging that Section 186(a)(2) captured conduct broader than just bribes made by employers with existing employment relationships with union members, the *Cody* Court noted that, § 186(a)(2) had been amended in 1959 specifically to "override the decision in *Ventimiglia v. United States*, 242 F.2d 620 (4th Cir. 1957)," which held that the prior version of § 186(a)(2) did not prohibit employer payments where the labor organization did not already represent the employer's non-union employees.

The *Cody* Court also distinguished the government's effort to rely on *United States v. Sink,* 355 F.Supp. 1067 (E.D.Pa.), *aff'd mem.,* 485 F.2d 683 (3d Cir.1973), in support of its argument. *Sink* is factually inapposite to the facts in *Cody* but has facts similar to those in the case before this court. In *Sink*:

> . . . there was no doubt that the employer was actively planning expansion into Philadelphia, where its present employees would have been admitted to the local union, and that the gift from the employer to the Philadelphia union representative was made at the time this expansion was being contemplated. Thus, the potential for a collective bargaining relationship between the employer and the union leader already existed, and it could be inferred that a motive for the gift was to discourage efforts to organize the employer's workers. As already noted, it is this type of corruption that the framers of § 186 sought to deter, quite unlike the instant case where the plans were unformed and the friendly relationship was one not then fairly susceptible to a more disparaging interpretation.

*United States v. Cody*, 722 F.2d 1052, 1059 (2d Cir. 1983). Like the employer in *Silk*, Employer 1 is alleged to have paid bribes to officials of Locals 638 and 200, to get those union officials to look the other way while Employer 1 bid for jobs using his non-union workers.

The plain language of the statute controls here. Defendants' motion to dismiss Count Three and portions of Count One—based on its argument that § 186(a)(2) does not prohibit the

conduct charged in those counts—is denied.

*Individual Motions to Dismiss by Wangerman, Egan & Gibson*

Wangerman and Egan argue that their alleged conduct falls outside the statute because they did not have authority over their unions' hiring decision, Employer-1's non-union employees, or whether Employer-1 was contractually available to hire employees from the defendants' unions. (Wangerman Mot. 7-11; Egan Mot. 6-7). Gipson claims that the evidence cannot show that he had any "connection to or knowledge of any payments made to" the other codefendants to convict him of any conspiracy charges. (Gipson Mot. 8). These arguments are quintessential challenges to the sufficiency of the evidence, which cannot be resolved until after the Government presents its case at trial. Accordingly, these motions are denied as premature, with leave to renew after the Government rests its case.

McCarron Outrageous Government Conduct Motion

McCarron claims that the Government's "outrageous" conduct in investigating this case violated his due process rights and thus warrants a dismissal of all charges against him. (McCarron Mot. 8- 11).

Employer-1 had an affiliation with Local 355 (a rival union to Local 638, one of the two unions that are the subject of the instant prosecution), and spoke on occasion with Kevin Barry, a Local 355 union official. As it happens, John Barry, the chief investigator who was originally working on the case for the Suffolk County District Attorney's office, is Kevin Barry's brother. McCarron alleges that the Government was "used by one union that seeks to destroy a rival union." (McCarron Mot. 8). McCarron argues:

> The Suffolk County District Attorney's Office collaborated with Local 355 (Employer-1 was signed up as a Local 355 union contractor) in a way that crossed the line between reasonable "stealth and strategy" to ferret out criminal activity, and outrageous government conduct. The outrage . . . was in the form of a union president using his brother, an SCDAO detective, for a non-law enforcement goal:

> not to ferret out union corruption but to crush its competition. And the SDNY, once it found out about the conflict of interest, still chose to perpetuate the tainted prosecution.

(McCarron Reply 23). It is McCarron's position that John Barry's involvement in this case created an actual conflict of interest, and that prejudice should be presumed, "just like in cases of attorney conflicts of interest. *Strickland v. Washington*, 466 U.S. 668 (1984)." (McCarron Reply 3).

While dismissal of an indictment is an available remedy in cases where the Government's investigative conduct is "so repugnant and excessive as to shock the conscience," *United States v. Romano*, 706 F.2d 370, 372 (2d Cir. 1983), no information presently before the Court suggests that this is any such case. Indeed, the burden of demonstrating outrageous government conduct in "sting" cases is formidable. The Second Circuit has rejected efforts to dismiss indictments in "sting" cases even where the Government guided unsophisticated, easily manipulated defendants' through every aspect of the commission of the crime. *See e.g., United States v. Cromitie*, 727 F.3d 194, 219 (2d Cir. 2013) ([A]s with all sting operations, government creation of the opportunity to commit an offense, even to the point of supplying defendants with materials essential to commit crimes, does not exceed due process limits); *see also United States v. Al Kassar,* 660 F.3d 108, 122 (2d Cir. 2011) ("[w]hile the sting operation in this case was elaborate and prolonged, there was no coercion or physical force, and nothing done was outrageous or a shock to the conscience."). I assure McCarron that the "misconduct" he alleges does not even begin to approach what I know about the reprehensibility of the Government's conduct in *Cromitie*—a case where I denied a motion to dismiss for outrageous government misconduct and was affirmed by the Second Circuit.

McCarron's conclusory allegations are derived from information the Government disclosed to the defendants at the outset of discovery about Employer-1's relationship with Local

355 and Kevin Barry, and John Barry's involvement in the case. The Government, no doubt, disclosed this information to comply with its obligation pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). The Court has read the Government's letter to counsel detailing, *inter alia*, the relationship between the Suffolk County District Attorney's Office Investigator and the "rival union" (Local 355), as well as the United States Attorney's Office decision to "wall off" John Barry from further involvement in the case upon learning that his brother was an official in Local 355. Nothing in the Government's disclosure suggests that the United States Attorney's Office, during its investigation, was—as defendant urges—doing the bidding of Local 355.

I assume that there will be cross-examination on this topic at trial. If evidence adduced at trial reveals that the United States Attorney's Office (not the Suffolk County District Attorney's Office) was acting as the agent for Local 355, the Court will entertain a renewed motion to dismiss based on outrageous government conduct. *See United States v. Cuervelo*, 949 F.2d 559, 567–68 (2d Cir. 1991) (A judge "may defer ruling on [an outrageous conduct motion] until after all the evidence has been submitted at trial and, if the defendant is convicted, the judge may handle the motion to dismiss as a post-verdict motion.") (citing *United States v. Dyman*, 739 F.2d 762, 768 (2d Cir. 1984)); *see also United States v. Myers*, 692 F.2d 826, 828-29 (2d Cir. 1982). "This approach can have several advantages: it is fair to both the defendant and the government; it conserves judicial resources; and, in a multi-defendant case, such as this one, it allows for consideration of the allegations raised by a single defendant without further delaying the prosecution of the government's case against that defendant or the co-defendants." *Cuervelo*, 949 F.2d at 567–68. Whether I would grant such a motion would depend on the state of the record at that time. But as the record exists, there is no basis whatsoever to grant this application.

McCarron's Motion to Suppress His Statements to Law Enforcement

McCarron moves to dismiss the statements he made to law enforcement on the grounds that his Sixth Amendment right to the assistance of counsel had attached at the time he made his statement. (McCarron Mot. 11). He is wrong.

"The Sixth Amendment right to counsel attaches upon indictment." *United States v. Bing Yi Chen*, 433 F. App'x 14, 15 (2d Cir. 2011); *see United States v. Gumaer*, 765 F. App'x 608, 613 (2d Cir. 2019), *as amended* (Apr. 19, 2019) (quoting *United States v. Gouveia*, 467 U.S. 180 (1984)) ("Attachment of the Sixth Amendment right to counsel occurs 'only when formal judicial proceedings are initiated against an individual by way of indictment, information, arraignment, or preliminary hearing.'"). As the Supreme Court has explained, that is because "[i]t is only at that time that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified," and "[i]t is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Gouveia*, 467 U.S. at 189 (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1972).

Thus, courts have routinely held that law enforcement interactions with a defendant before formal judicial proceedings are initiated do not run afoul of the Sixth Amendment. *See, e.g.*, *Kirby*, 406 U.S. at 690 (declining to extend Sixth Amendment protection to defendant's participation in a pre-indictment lineup); *Gumaer*, 765 F. App'x at 614 (Sixth Amendment rights did not attach prior to defendant's initial appearance before a judicial officer, even where a complaint was sworn out against the defendant); *Alexander v. Conn.*, 917 F.2d 747, 751 (2d Cir. 1990) (police could question defendant without the presence of counsel about an uncharged homicide even though defendant had previously requested counsel when arraigned on an arson

charge).

Additionally, a defendant may waive his Sixth Amendment right if the waiver is "voluntary, knowing, and intelligent . . . [,]whether or not he is already represented by counsel." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). "[G]iving an indicted defendant *Miranda* warnings is sufficient to make 'knowing and intelligent' his waiver of the [S]ixth [A]mendment right to counsel, even if the defendant has not been expressly informed of the indictment pending against him." *United States v. Charria*, 919 F.2d 842, 848 (2d Cir. 1990); *see also Patterson v. Illinois*, 487 U.S. 285, 296 (1988) ("As a general matter, . . . an accused who is admonished with the warnings prescribed by this Court in *Miranda* . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.").

The Government's questioning of McCarron came before he was indicted—very shortly before, it is true, but the bottom line is that his right to counsel had not attached. That is because the indictment in this case was returned at approximately 11:30 a.m., one hour after McCarron began giving his statements at approximately 10:30 a.m. (*See* Ex. A (e-mail from Grand Jury Coordinator to Magistrates Courtroom Deputy dated October 1, 2020); McCarron Video of Statement at 2:21).

In his motion, McCarron claims, "[e]xactly what time the indictment was returned is irrelevant" because the Government had informed the arraignment unit of Magistrates Court that it intended to go to the grand jury at 10:00 a.m. to secure an indictment. (McCarron Mot. 12). But an intention to seek an indictment is not the same thing as the initiation of formal judicial proceedings. In *United States v. Frank*, 8 F. Supp. 2d 284 (S.D.N.Y. 1998), a defendant alleged a Sixth Amendment violation because he was interviewed by law enforcement at the same time that federal prosecutors were presenting an indictment against the defendant to grand jury. In denying

the defendant's motion, Judge Cote rejected the defendant's argument that the Sixth Amendment attaches while the Government is making a presentation to the grand jury, finding that, "In the area of criminal procedure, bright line rules are necessary to give guidance to law enforcement authorities." She held that the defense's proposed interpretation of the Sixth Amendment "would invite utter chaos into the activities of law enforcement personnel, who would be left to guess at what point a contemplated prosecution had developed such that the Government was 'at' the initiation of formal proceedings." *Id.* at 306. Thus, McCarron's Sixth Amendment right attached only once the indictment was returned in this case.[2]

By the time McCarron was indicted and his Sixth Amendment right had attached, he had already waived that right because he knowingly, intelligently, and voluntarily waived his *Miranda* rights at the outset of the interview. *See Charria*, 919 F.2d at 848. The video of McCarron's interview reveals the following exchange before McCarron gave any statements to law enforcement:

> Assistant Special Investigator ("ASI"): I'm gonna read you your *Miranda* warnings. Just let me know if you understand everything I talk to you, okay?
>
> [McCarron nodded.]
>
> ASI: You have the right to remain silent. Do you understand?
>
> McCarron: Yes.
>
> ASI: Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer right now and have him present with you while you are being questioned. If you cannot afford a lawyer and want one, a lawyer will be appointed for you by the court before any question if you decide to answer the questions now without a lawyer present. You will have the right to stop the question at any time until you talk to a lawyer. Do you understand each of these rights as expressed to you?

---

[2] Moreover, while it may often be true that "a grand jury might indict a ham sandwich" if asked to do so by a prosecutor, (*see United States v. Laurent*, 861 F. Supp. 2d 71, 89 (E.D.N.Y. 2011) (Weinstein, Judge) (quoting revealing 1985 statement by the then Chief Judge of New York State, Sol Wachtler), the fact is that the grand jury, not the Government, indicts. So, the fact that the Government was presenting was no guarantee that an indictment would be returned.

McCarron: Yes.

ASI: Do you wish to contact a lawyer?

McCarron: No.

ASI: With these rights in mind, do you wish to talk to me now without a lawyer?

McCarron: Sure.

(McCarron Vid). Following this exchange, McCarron read and signed a *Miranda* waiver before proceeding with the interview. (*Id.*). He did not invoke his right to an attorney thereafter. (*Id.*).

Not only did McCarron verbally confirm that he wished to waive his *Miranda* rights, but he also "read[], acknowledge[d], and sign[ed] an 'advice of rights' form before making a statement." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014). There is no evidence of any threat or coercion, or that McCarron was confused about his rights. Thus, McCarron's waiver was knowing, intelligent, and voluntary. *Id.*

Nor does McCarron claim otherwise. He admits in his declaration that "[t]he detectives read me my rights and I agreed to talk to them." (McCarron Decl.¶ 14). "Even absent being informed that he was under indictment, the *Miranda* warnings gave [McCarron] ample notice of the dangers of self-representation at a critical stage in the proceedings against him." *Charria*, 919 F.2d at 848.

McCarron's motion to suppress is denied.

Gibson's Motion for Severance

Finally, Gipson asks the Court to sever his case from that of his co-defendants on the ground that he will suffer undue and unfair prejudice from a joint trial. "In this case, the salient factors are the complexity of the Indictment, the number of defendants, the length of a joint trial compared to that of a separate trial, the disparity of the evidence among defendants, and the prejudice to Mr. Gipson from evidence to be admitted against other defendants and

which Mr. Gipson had nothing to do with." (Gibson Mot. 4).

"If the joinder of . . . defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials . . . or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). A defendant who "seeks separate trials carries a heavy burden of showing that joinder will result in substantial prejudice." *United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994). The defendant must show prejudice that is "unfair" and "not merely that he might have had a better chance for acquittal at a separate trial." *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011). Further, the prejudice must be "sufficiently severe to outweigh the judicial economy" of a joint trial. *Id.* Because Federal Rule of Criminal Procedure 14 explicitly permits a district court to "provide any other relief that justice requires," the rule "does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993). Even in the rare circumstances where "the risk of prejudice is high," severance is not required, as "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* at 539.

Gipson argues that the disparity between the proof that will be elicited against his codefendants will dwarf the proof against him; thereby, prejudicing his case. But the Government represents that the evidence against Gibson will be substantial, as he, like his codefendants, was apparently recorded accepting bribes.

Gipson also says that the sheer appearance of being tried together with his 10 codefendants would cause him prejudice; but that is no longer an issue since some of his codefendants have now pleaded guilty.

Gipson asserts that one of the counts is a "sprawling RICO conspiracy in which Mr. Gipson is not charged" (Gipson Mot. 4). However, the Government represents that the proof of that RICO conspiracy has substantial overlap with the proof on the remaining two charges with which Gipson is charged, because all three charges arise from the same bribery scheme. Thus, there are significant efficiencies to trying Gipson with his codefendants, given the expected overlap in witnesses and evidence.

Gipson points out that, unlike his codefendants who represented Local 638, he is the only defendant who represented Local 200. But that distinction is hardly dispositive, where, according to the Government, Gipson enjoyed a tightknit relationship with some of his codefendants and accepted one of the alleged bribes in this case alongside codefendants Cahill and Hill, while the three men dined with Employer-1 at a diner in Long Island. The Court's charge and the verdict sheet can be tailored to eliminate any jury confusion.

Gipson asserts that he would be prejudiced by a joint trial because "[i]t is doubtful that at a trial of Gipson alone, the many bribes allegedly paid to the other 10 co-defendants alleged in the RICO count (in which Gipson is not charged) would be admissible." (Gipson Mot. 5-6). But the Government represents that those bribes are also direct proof of the remaining two conspiracies with which Gipson is charged—as such, the evidence would be admitted even in a trial against Gipson alone. In any event, the admission of that evidence—even if it would be excluded at a trial against Gipson alone—does not amount to "unfair" prejudice, particularly where any supposed disparity in evidence might benefit Gipson's potential arguments about the Government's absence of proof against him personally. *See, e.g.*, *United States v. Scarpa*, 913 F.2d 993, 1015 (2d Cir. 1990) ("differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for

separate trials"); *Zafiro*, 506 U.S. at 540 (defendants "are not entitled to severance merely because they may have a better chance of acquittal in separate trials"). And Gibson's concerns about "[g]uilt by association" will be blunted by the Court's limiting instruction to the jury that they must not consider evidence admitted specifically against one defendant, when deciding the cases of the other defendants. *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003) (stressing that "the district court explicitly instructed the jury to consider the defendants individually").

Gipson's motion for a severance is denied.

Trial Disclosure Schedule

The trial of this matter is scheduled to commence Wednesday, January 18, 2023, at 9:30 a.m.

Gibson asks the Court to order the Government to produce a list of exhibits 60 days before trial, a list of witnesses 45 days before trial, and any "bad act" evidence immediately.

The Court sets the following dates for Government disclosures and pretrial filings: Government to provide 404(b) notice and file any *in limine* motions by December 1, 2022; Defense response to the Government's *in limine* motions and all defense *in limine* motions are due December 15, 2022; Government's response to defense *in limine* motions is due December 22, 2022.

The Government is to turn over all 3500/Giglio material by December 1, 2022.

The Government will provide defendant with an exhibit list, no later than January 13, 2023.

The Government will provide defendant with a list of the witnesses it intends to call, on the Friday before the trial week those witnesses are scheduled to testify. Should defendants elect

to call witnesses, defendants will reciprocate by providing the Government with similar notice of the witnesses to be called.

Proposed *voir dire* questions and all request-to-charge are to be submitted prior to the final pre-trial conference.

The Court will hold a final pretrial conference on January 5, 2023, at 11:00 a.m.

This constitutes the decision and order of the Court.

October 18, 2022

Colleen McMahon
United States District Court Judge