

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

_____

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 15, 2023

**BY ECF**

Honorable Colleen McMahon
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

> Re:   **United States v. James Cahill**, 20 Cr. 521 (CM)

Dear Judge McMahon:

Until his arrest, defendant James Cahill was the ultimate power player in New York State labor.

He was the longtime President of the New York Building and Construction Trades Council (the "Trades Council"), a union organization that represents over 200,000 members involved in the building and construction industries.  He served on the Executive Council of the New York AFL-CIO.

He was a close friend and confidant of the then-Governor of New York, Andrew Cuomo.  He rubbed shoulders with Senators, Members of Congress, and White House staff.[1]  He was praised in the labor press for his "Lifetime of Service."[2]  His decisions affected hundreds of thousands of union workers and billions of dollars worth of infrastructure projects.

In public, Cahill was the consummate union man, devoted to the principle of "a fair day's pay for a fair day's work."[3]

In private, Cahill was someone else entirely.  He routinely accepted cash bribes from a non-union contractor ("Employer-1") with whom he had enjoyed a yearslong quid pro quo relationship.  He doled out favorable labor agreements in exchange for the bribes he received.  He spoke scornfully of unions, including a union he once served, Local 638 ("Local 638") of the

_____

[1]   See, e.g., Doc. Nos. 466-2 (letters from then-Governor Cuomo and State Senator John J. Flanagan, among others), 471-1 (letter of support from Former Congressman Peter King).

[2]   Sarah Krieger, James Cahill Leads with a Lifetime of Service, Labor Press (Oct. 5, 2017), available at https://www.laborpress.org/james-cahill-leads-with-a-lifetime-of-service-2/ ("Lifetime of Service").

[3]   Lifetime of Service (quoting Cahill).

United Association of Journeyman and Apprentices of the Plumbing and Pipefitting Industry (the "UA"):

> CAHILL:      Listen to me.  If you become union, you'll have 12 fucking guys on your back.
>
> Employer-1:  I'm not becoming union.
>
> CAHILL:      Tell everybody to go fuck themselves.

(Presentence Investigation Report ("PSR") ¶ 32.)

He reveled in the power that he exercised over union officials, many of whom he persuaded to meet with Employer-1 and many of whom accepted their own bribes from Employer-1:

> CAHILL:  I don't know the reason why they're so petrified of me.  I never gave them a reason to be petrified of me. . . . But didn't they shit their pants when you told them you're friends with me?

(PSR ¶ 32.)

And he boasted openly about his relationships with organized crime figures, including Serbian Organized Crime member Mileta Miljanic, the Westies gang, and members of the Gambino Crime Family, including caporegimes Louis Filippelli and Andrew Campos.

Numerous affected union members have urged the Court to impose a substantial prison sentence on Cahill to reflect the seriousness of the offense and to deter labor corruption.  Local 638 and the Trades Council have submitted statements describing the lasting damage that Cahill's corruption inflicted on their organizations.

The Court has issued an Order suggesting that because Cahill was "the source of the rot" and because the Guidelines range does not take into account Cahill's stature within the labor community or his receipt of pre-investigation bribes, the stipulated Guidelines range of 33 to 41 months' imprisonment (the "Stipulated Guidelines Range") may be inadequate to serve the purposes of sentencing.  (Doc. No. 392.)  The Probation Office similarly recommends an above-Guidelines sentence.

The Government agrees with the Court.  For the reasons set forth below, the Government respectfully submits that an above-Guidelines sentence of at least 60 months' imprisonment is sufficient but not greater than necessary to achieve the purposes of sentencing.[4]

---

[4]   The Plea Agreement expressly permits the parties to seek a sentence above or below the Stipulated Guidelines Range based on the factors in 18 U.S.C. § 3553(a).

## I.     Facts

### A.  The Offense Conduct

James Cahill began his working life as a steamfitter and he was a member of Local 638, one of the unions he later corrupted.  He steadily rose up the ranks of union office, becoming a Business Agent for Local 638, then an International Representative for the UA, and ultimately President of the Trades Council.  (PSR ¶¶ 18, 97–100.)

### 1.  The Pre-2018 Quid Pro Quo Relationship

Around the time that Cahill became International Representative in 1998, he met Employer-1 who owned a steamfitting/plumbing business that operated in New York City and Long Island.  On and off during the ensuing years and leading up to the inception of the investigation in 2018,[5] Employer-1 paid Cahill cash bribes in exchange for union-related benefits, including job-specific labor agreements with Local 638.  Cahill acknowledges that, during a many-year period, he accepted at least $100,000 in cash bribes from Employer-1 and that his authorization of the labor agreements was a quid pro quo in exchange for those bribes.  (Plea Agreement at 2 n.1; PSR ¶ 19.)[6]

### 2.  The Labor Corruption Scheme

In August 2018, Employer-1 approached the Suffolk County District Attorney's Office ("SCDA") to disclose his participation in various crimes, including his corrupt relationship with Cahill.  On the basis of Employer-1's information, the SCDA initiated a labor corruption investigation and, among other things, obtained wiretaps on phones used by Cahill and other investigative subjects.[7]  At the direction of law enforcement, Employer-1 met and spoke repeatedly with Cahill to explore what actions Cahill might take in exchange for additional bribe payments.  During the course of the investigation, Cahill introduced Employer-1 to various union officials who could perform favors for Employer-1.  (PSR ¶¶ 14–18.)

---

[5]   During a multiyear period from the late 2000s to the early 2010s, Employer-1 took a hiatus from the steamfitting/plumbing business.

[6]   Based on discussions with the defense, the Government understands there are differences of view as to the exact amount of these pre-2018 bribes, the specific years of the quid pro quo relationship, the number of labor agreements Cahill delivered, and whether the labor agreements were beneficial to Local 638.  The Government does not ask the Court to rely on facts beyond what the parties stipulated to in footnote 1 of the Plea Agreement.

[7]   In its sentencing submission, the defense repeatedly accuses the Government of obfuscating the fact that Employer-1 began acting as a confidential source in 2018.  The accusation is baseless. The Government's filings, the Court's rulings, and the parties' remarks on the record make clear that no one has ever been confused on this point.  (See, e.g., Doc. No. 71 (Government letter, publicly filed in December 2020, making clear that Employer-1 was a confidential source).)

### a.  Cahill Introduces Christopher Kraft and Patrick Hill

In fall 2018, when Employer-1 began meeting Cahill as part of the investigation, Local 638 was in the midst of conducting elections, which ultimately led to a number of the defendants in this case—including Christopher Kraft and Patrick Hill—being elected, with Cahill's support, to positions as Business Agents.

At an early bribe meeting, on October 22, 2018, Cahill introduced Employer-1 to Kraft, whom Cahill identified as a Local 638 Business Agent who could both help Employer-1 successfully bid projects with a developer ("Developer-1") and who would provide Employer-1 with cover from the union.  As Employer-1 recounted, in Cahill's presence, during the meeting:

> Employer-1:  **So Jimmy came up with an idea** . . . to help [Developer-1] . . . With them, only as good as the last job, you know. . . . I was in the running for Yonkers.  They give it to a no name guy. . . . **If it's blessed by the Building Trades New York President, you know, [Developer-1] will fold to gentle pressure.**  So, um, they got work in the City.  They got work on Long Island.  They love to make 638 their friend.  **So Jimmy thought you'd be the guy to alleviate that.**[8]

(PSR ¶ 27; Ex. A (draft transcript of October 22, 2018 meeting) at 9–10.)  When Kraft asked whether Employer-1 would be signing with Local 638, Employer-1 made clear that he was not committing to employing Local 638 workers if he got the relevant projects:

> Employer-1:  Right now, they got no pressure to do anything.  So they're not going to do anything, **but a little pressure**. . . . **Our thoughts were I'm just going ahead.  You guys are still trying to sign me.  I'm really not that, I don't really know if I want to sign yet, you know what I mean?**  So if you help me get [Developer-1] work, **maybe I'll sign**.  And that was kind of the angle.  It's something that happens all the time.  It's not crazy. . . . And then, you know, we take it from there.  **But in the meantime, everybody is happy.  Everybody makes a couple bucks.**

---

[8]   All bolded text in this submission are emphases added by the Government.  "[U/I]" refers to words that are not readily intelligible, and ellipses indicate omitted matter.  The transcript excerpts cited herein are based on the Government's draft transcripts and wiretap applications, which were previously produced to the defense in discovery.   While the Government endeavored to be accurate in preparing the draft transcripts, there may be minor discrepancies due to the audibility and clarity of certain recordings.  In preparation for sentencing, the Government has re-reviewed parts of certain recordings and has noted where it believes the recordings contain more audible words than the original draft transcripts reflect.  To the Government's understanding, there is no dispute between the parties as to recordings' or transcripts' material substance.

(PSR ¶ 27; Ex. A at 10.)  Later in the conversation, Employer-1 explained that he was asking Kraft to be his "rabbi" in Local 638—meaning that if anyone in the union had a problem with Employer-1, Kraft would help sort it out.  Cahill interjected that, following the elections, it was likely Kraft would take over a different geographical area and Patrick Hill ("Patty" or "Paddy") would take over Kraft's existing jurisdiction:

> Employer-1:   Jimmy said to speak frankly so I'm gonna speak frankly. . . I may or may not have guys on.  **I want you to be on my team helping me and I'm on your team.**  Get the work and we can figure out later if we wanna, you know, how we want to do it.
>
> CAHILL:        Chris will probably move into the City.  [U/I]
>
> Employer-1:   Yeah, but I need a guy in there.  **I need a rabbi in particular** working for 638.  I need everybody to talk to you and to me.  I don't know how to say it any other way
>
>                 . . .
>
> CAHILL:        If we get **the kid we really want to get in is Patty Hill**.  Patty will take his area.

(Ex. A. at 14–15.)  As the meeting continued, Kraft explained that one of the projects Employer-1 asked about, which was in Oceanside, was not in Kraft's area.  After Kraft left, Employer-1 complained to Cahill:

> Employer-1:   **I thought it was this fucking guy's area.  I thought it was this guy's area.  That's why I'm talking about it.**  The job in Oceanside—I want that fucking thing.
>
> CAHILL :       Oceanside is his area.
>
> Employer-1:   No, it's not.  It's [Business Agent-1]'s area.  We gotta get [Business Agent-1] over here. . . .  West Side.  It's [Business Agent-1]'s area.  Is he good?  Can we talk to him and do business with him?
>
> CAHILL:        **I'll talk to him.**

(Ex. A. at 38.)  Employer-1 then told Cahill that, if Kraft was not the relevant Business Agent, Kraft was not worth bribing ("If it ain't his area, I'm not gonna fuckin' do nothing with this guy.  What am I going to do that for?  Waste my money.").  Cahill attempted to placate Employer-1 by saying that, even if the Oceanside project was not in Kraft's area, Kraft is "gonna be number one" at the union and "is a good kid to know" because "everybody [is] afraid of him."  (Ex. A. at 38–39.)  Employer-1 then made explicit that he had no intention of actually signing union workers:

> Employer-1:   Listen, here's what I want.  **I want to not have to sign with anyone and be able to use everyone's name.**

> CAHILL:        **I don't blame you.**

(PSR ¶ 29; Ex. A at 39.)  Cahill and Employer-1 then discussed the upcoming elections again, and Cahill stated that he was confident he and codefendant Robert Egan could control Kraft and Kraft could bring in Hill.  Cahill also offered to provide Employer-1 with "cover" by having Employer-1 sign a union agreement and that he could help Employer-1 get a project:

> CAHILL:        **The kid that we're pushing is Patty Hill**. . . . Our goal in this business—after this election is gonna be complete [U/I] that **his strongest ally—Chris, is me and Bobby Egan.**
>
> Employer-1:   Alright.
>
> CAHILL:        He's got this kid Patty Hill and he's got a, **Patty Hill never held office but we want him in there [U/I] do the right thing.**
>
> Employer-1:   Yeah
>
> CAHILL:        So he'll get that.  [Business Agent-1]'s either gonna stay in his area or there is gonna be somebody new.  [U/I] **Nobody's gonna bother you one way or the other.  If you need cover** by [U/I] **we'll sign you** [U/I] you sign on a different [U/I] **we'll give you a project.**

(Ex. A at 40.)  Employer-1 again reiterated that he did not wish to actually sign with the union and instead wanted to be able to tell developers that he was negotiating actively with the union:

> CAHILL:        If you were signed today.  [U/I]
>
> Employer-1:   I don't, **I don't gotta be signed.  I just gotta be able to say I'm signed.**
>
> CAHILL:        **Yeah, yeah just say you signed.**[9]
>
> Employer-1:   **Use his name.**  I want it, listen in case somebody called, I wanted to say yeah, yeah, negotiating.  So Chris said he would do that, so that's good.

(PSR ¶ 30; Ex. A at 42.)  Cahill and Employer-1 returned to speaking about Business Agent-1, and Cahill offered to speak with Business Agent-1 on Employer-1's behalf: "I can ask him, I'll say look, I got somebody I met with.  He's non-union.  **He wants no problems, you know?**"  At other points during the meal, Cahill also touted his influence over codefendants Scott Roche

---

[9]    The word "just" was indicated with an ellipsis in the draft transcript prepared by the Government.  In preparation for sentencing, the Government has re-reviewed this recording and believes "just" to be clearly audible.  The defense does not dispute that Cahill said the word "just." (See. Def. Sub'n at 47.)

("Scott has come here for advice.") and Robert Egan ("Egan's good, just don't talk to him.  I can talk to him.").  (Ex. A. at 22, 27.)

At the conclusion of this steak-and-wine dinner (which Employer-1 paid for), Employer-1 invited Cahill to join him in the men's bathroom, where Cahill accepted $3,000 cash from Employer-1.

Shortly after this initial meeting, Hill was elected to serve as Business Agent in the area of Nassau County where Employer-1 expressed interest in bidding a project.  On December 18, 2018, Cahill and Hill spoke by phone.  During that call, Cahill told Hill that Employer-1 was working on a project in Nassau County and invited Hill to meet Employer-1 at a restaurant the following day:

> CAHILL:     He's a crazy guy.  He'll drive you crazy, **but he's our guy**. . . . Put that on your calendar and you'll meet him.  **But don't tell anybody you're meeting him.  Keep that quiet, you know?**
>
> Hill:         No, no, absolutely not.  **Between you and me.**

(Ex. B (excerpt of wiretap application quoting December 18, 2018 call) at 30.)

The following day, December 19, Cahill and Hill met with Employer-1 at a restaurant. Before Hill arrived, Cahill described to Employer-1 his understanding of why they were meeting: "Fucking favors.  **I'm in the fucking favor business.**"  Cahill also assured Employer-1 that Roche was under his control: "Scott Roche is the main guy, and **he don't want to do nothing unless he talk[s] to me so far.**  I think it's gonna work out.  I'll bring him to you.  I'm gonna see him tomorrow.  He asks me who to put where, what do you think?" (Ex. C (draft transcript of December 19, 2018 meeting) at 1–2.)  The following exchange occurred:

> CAHILL:     You've got to tell me if you really want to sign or you don't want to sign. . . .
>
> Employer-1:  **I don't want to sign.**  I want to keep doing what I'm doing.

(Ex. C at 2.)  Before Hill arrived, Cahill accepted a $2,500 cash bribe from Employer-1, and Employer-1 told Cahill that he intended to also bribe Hill.

> [Employer-1 gives bribe to Cahill]
>
> CAHILL:     Thank you.  Merry Christmas.
>
> Employer-1:  **I'm going to do something for him too.**
>
> CAHILL:     Today?
>
> Employer-1:  Yeah, why not?  It's Christmas, man.  The sooner I get to know him, you know?  **Start off everything in the right way.**  I've got work in his area now.

> . . .

> CAHILL:    **Well, I'm just going to tell him now. Like I said, let's just. We leave [Employer-1] alone.**

(Ex. C at 4.)  Indeed, after Hill arrived, Cahill instructed Hill: "Here's why I wanted you to meet [Employer-1]—he just met Chris recently, too.  **In Nassau, you leave [Employer-1] alone.**" (Ex. C at 17.)  At this meeting, Employer-1 paid Hill a $2,500 bribe, which Hill initially protested before ultimately accepting.

On the same day, after the bribe meeting, the following call was intercepted between Cahill and Hill:

> CAHILL:    **Welcome to the real world.**  [Laughs]

> Hill:      That guy is a fucking nut.  Nice guy though.  Very nice guy.

> CAHILL:    Yeah, but he's our—but **he's our nut.**

Cahill then proceeded to tell Hill "get your head on straight and you'll be fine" and "**you're going to have a ball.**"  (Ex. D (excerpt of wiretap application quoting December 19, 2018 call) at 31.)

As the chart at paragraph 24 of the PSR reflects, Cahill had many more meetings with Employer-1, often with Kraft or Hill present.  Having been inducted by Cahill into the corrupt scheme, Kraft and Hill proceeded to have many bribe meetings of their own with Employer-1. They in turn, along with Cahill, recruited other Local 638 officials to meet with Employer-1.

During meetings with Cahill, Employer-1 made clear that his goal was to string Local 638 along: to reap the benefits of being affiliated with the union without incurring the costs of being a bona fide union contractor.  Cahill was fully supportive.  For example, at an October 21, 2019 bribe meeting, the following exchange occurred:

> CAHILL:    Listen to me and listen to me very carefully.  Do not sign an agreement with [Scott Roche].

> Employer-1: No.  I just wanna do what I want.

> CAHILL:    **You're gonna fuck everybody as much as you want.**

> Employer-1: Okay.

> CAHILL:    And you want everybody to hate you.  Because when they hate you, they're gonna come for you.[10]

---

[10]   This line is quoted at paragraph 31 of the PSR as: "because when they hate you, they're going to come to me."  (PSR ¶ 31.)  In preparation for sentencing, the Government has re-reviewed this recording and believes the correct quotation should be "because when they hate you, they're going

Employer-1:   All right.

CAHILL:        Understand?  Pat is the same way.  Kraft is the same way.  You don't
               need Kraft right now.  Be nice to him.  Say hello."[11]

Later on in the same meeting:

CAHILL:        **Listen to me.  If you become union, you'll have 12 fucking guys on your
               back.**

Employer-1:   I'm not becoming union.

CAHILL:        **Tell everybody to go fuck themselves.**

(PSR ¶¶ 31–32; Ex. E (draft transcript of October 21, 2019 meeting) at 87–88, 107.)

Similarly, during a March 13, 2020 bribe meeting, Cahill again counseled Employer-1 not
to sign with the union, in order to maintain maximum leverage:

CAHILL:        Maybe the more and more I think, **no business should want to sign an
               agreement with anybody.  You want them to chase you.  What are they
               gonna do?** . . . And you just tell them, **oh we won't have lunch no more.
               They'll shit their pants**, they'll shit their fucking pants.

Employer-1:   You have a way of cutting' through the shit to what it—you're right, though.

And later, in the same meeting:

CAHILL:        **You don't have to sign nothing.**

Employer-1:   I'm not signing Jimmy, I'm not signing shit.

(Ex. F (draft transcript of March 13, 2020 meeting) at 47–48.)

### b.  Cahill Introduces Robert Egan and Scott Roche

Kraft and Hill were not the only Local 638 officers whom Cahill personally encouraged to
meet with Employer-1 for the purpose of accepting bribes.  On November 13, 2018, Cahill told
Employer-1 that Cahill had "lined up" Robert Egan, the Financial Secretary-Treasurer of Local

---

to come *for you*," which is also how this statement was transcribed in the Government's draft
transcript.

[11]  The words "Be nice to him.  Say hello" are indicated with an ellipsis in the original draft
transcript prepared by the Government.  The Government has reviewed the recording again and
confirmed that these words are audible.

638.[12]  The three men met the following day, November 14, for a meal.  During that meal, Employer-1 posed the question: "So talk to me about 638.  Who's got power there?  Who's going to be chasing me?  I don't know anybody there no more."  Cahill responded: "You're going to have an open field for about six months."  (Egan PSR ¶¶ 16–17.)

Later in the meal, Employer-1 invited Cahill to the bathroom, where Employer-1 paid Cahill a $3,000 cash bribe.  Employer-1 then made clear that he was about to bribe Egan as well: "**So let me go out first with him.  I'll sit with him and do my thing, alright?**"  Employer-1 then returned alone to the table with Egan and slipped Egan $3,000 under the table.  (Egan PSR ¶ 18.)

Cahill repeatedly boasted about his control over the Business Agent at Large of Local 638, Scott Roche ("Scott Roche is the main guy, and he don't want to do nothing unless he talk[s] to me so far.  I think it's gonna work out.  I'll bring him to you.  I'm gonna see him tomorrow.  He asks me who to put where, what do you think?").  Given Roche's importance in the union and Cahill's remarks, Employer-1 requested a meeting.

For example, on a recorded October 18, 2019 call, the following exchange occurred:

Employer-1:  I just feel like, when it comes to Roche, when we're talking about seeing him, I don't want him to think I'm fucking avoiding him, ducking him.  I don't know, man, if he's the guy.

CAHILL:  Yeah, well, I'm supposed to play golf with him Sunday, alright?  **So I'll have a little chat with him Sunday.  See what's on his mind.**

(Ex. G (excerpt of wiretap application quoting October 18, 2019 call) at 38.)

When a meeting with Roche did not readily materialize, Employer-1 pressed Cahill again.  At a meeting on October 21, 2019—at which Cahill accepted another $2,500 bathroom bribe—the following exchange occurred:

Employer-1:  Listen, but you gotta get me with Roche. . . . I don't want these guys spinning it on me with him that I'm not going to him.  You're taking care of that, right?

. . .

CAHILL:  I already spoke to Roche. I said to him a couple weeks ago.  **I said, you know, you should meet [Employer-1].  He said okay**, but here's the problem with Roche.  **Roche don't want the job.  He's**

---

[12]  The Government does not contend that Employer-1 met Egan through Cahill.  Egan was one of the conspirators—along with Cahill, Gipson, and Wangerman—who knew and had prior corrupt dealings with Employer-1 before this investigation.

> **hiding. . . . he's just hiding from his responsibilities. . . . And that makes us more powerful.**

(Ex. E at 85–87.)[13]

The meeting with Roche took place on January 13, 2020. Cahill was present and actively participated in the discussion. Roche explained that he resisted meeting with Employer-1 because of concerns that Employer-1 was dealing with Kevin McCarron, who had a poor reputation amongst other Business Agents. Cahill interjected that he had advised Employer-1 not to speak with McCarron, and Employer-1 apologized. (Roche PSR ¶ 19.)

Employer-1 then told Roche that he wanted assistance getting a "UA agreement"—that is a labor agreement that would cover any work that Employer-1 did involving the UA (the parent union of both Local 638 and Local 200). Cahill suggested that he understood Employer-1 to be requesting a "national agreement," rather than the type of residential project agreement that the UA used in New York City. Later in the meeting, Employer-1 also asked for Roche's help in building a relationship with Developer-1: "They want help. They know they should have guys, you know, that are, you know, involved in the process. So maybe we have lunch, we talk about it." (Roche PSR ¶¶ 20–22.)

During the meal, when Roche got up to use the bathroom, Employer-1 turned toward Cahill and said: "You gotta piss, too. Okay? After." Inside the bathroom, Employer-1 handed Roche a $2,500 bribe and said: "Now we can meet without him." (Roche PSR ¶¶ 22–23.) In a separate bathroom trip with Cahill, Employer-1 handed Cahill a $2,500 cash bribe as well. Cahill told Employer-1: "**I think that was a good meeting for you . . . Have lunch with him privately . . . You don't need me there.**" (Roche PSR ¶ 26.)

### c. **Cahill Pressures Brian Wangerman**

Cahill also attended a bribe meeting with Brian Wangerman, a Local 638 Business Agent with whom Employer-1 already had a historical corrupt relationship.

On May 16, 2019, Wangerman appeared at a meeting between Cahill, Hill, and Employer-1. Employer-1 pulled Wangerman to the bathroom and paid him a $2,000 cash bribe, making clear that he wanted Wangerman's help in getting projects: "Listen, put that in your pocket. Do me a favor. Let's get some fucking business going, okay? I need business. I need work." (Wangerman PSR ¶ 16.) Back at the table with everyone present, Cahill addressed himself to Wangerman:

CAHILL:    **Brian—do you have anything to toss [Employer-1's] way? Did you talk to him?**

Wangerman:  Got a couple of things that, uh, you know that whole area, unfortunately the freaking Jews bought all of East New York.

---

[13] The word "powerful" is marked with "—" in the draft transcript but, based on the Government's review, is audible on the recording.

(Wangerman PSR ¶ 16.)  Later in the conversation, Employer-1 addressed the table: "Yeah, listen. We—Brian already talked—**me and already – Brian already talked, so he's gonna—we're gonna get back on the train. Him and I had a great run there in—you know, back—you know, in the day**, and it was all good, and you know, whatever."  (Wangerman PSR ¶ 17.)

### d. Cahill Pressures Arthur Gipson

Cahill's corrupt conduct was not limited to Local 638.  He also intervened on Employer-1's behalf with Arthur Gipson, a Business Agent with Local 200, the plumbers local.  Employer-1 had a longstanding personal and (corrupt) professional relationship with Gipson.  During the investigation, Employer-1 asked for Gipson's assistance in signaling Local 200's support—or at least Local 200's non-opposition—if Developer-1 awarded projects to Employer-1.

On August 19, 2020, Cahill, Hill, Gipson, and Employer-1 met at a restaurant.  Employer-1 bribed Cahill in the car on the way to the diner and the two of them plotted what Cahill would say to Gipson—specifically, that Gipson should refrain from interfering with Employer-1's efforts to get a project with Developer-1, even though Employer-1 had unresolved debts with the UA:

> CAHILL: What's going on?  What are we going to do with this?  **Is this fucking Artie showing up?**
>
> Employer-1: He's showing up.  **So listen.  I got him primed, 'cause he knows he's out unless you say he's in.**  So that's it. . . . He knows.  Hill and me got him scared shitless. . . . We're not even talking about me signing.  We're talking about me just doing the job.
>
> CAHILL: Go do the fucking job.  [U/I] tell him, I says, the UA's not gonna let [Employer-1] come in unless he pays all commitment debts, and he's fighting with them.  So what the fuck are you gonna do? . . . And so there's a guy that can't come back. . . . Do yourself a favor.
>
> Employer-1: **So tell him to leave me the fuck alone.**
>
> . . .
>
> CAHILL: [U/I] do what you gotta do **but stay the fuck away from the job.**

(Ex. H (draft transcript of August 19, 2020 meeting) at 3–4.)

At the meeting, Cahill followed through with the plan.  When Gipson observed that he has historically required Developer-1 to do projects with union contractors, Cahill cut in:

> CAHILL: So let's go back to the [Developer-1] job where I allowed you to do all the sprinklers and [U/I].  **So sometimes you're in the boat and sometimes you're out of the fucking boat.  This time you're gonna be out of the boat.**  Now you want me to give you the long time explanations or **take it from me, stay out of the boat for a while.**  Let's see if we can fix [U/I].  **I'd appreciate it.**

(Ex. H at 72–73.)  Gipson expressed concern that other officials at Local 200 would be angry with him for taking this course of action:

Gipson:  Let's just talk about this.  **I'm gonna have to have some fucking protection here.**  Cause I'm gonna catch a lot of shit for this.  You guys realize this.

Hill:  So am I.  I am, too.

Gipson:  You don't have history there.  I do.

(Ex. H at 91; Gipson PSR ¶ 23)[14]  Gipson then proposed engaging in a charade of trying to sign up Employer-1: "Why can't I try to sign you?  I've got to go down that road. . . . I gotta make that attempt to legitimately sign you.  You know what I mean?  I gotta let them tell me no."  (Gipson PSR ¶ 23.)  Cahill asked:

CAHILL:  Who do you want to [U/I] . . .

Gipson:  My boss—my boss.  My organization.  **I want to cover my tracks because . . .**

(Ex. H at 99.)[15]  Cahill then offered a suggestion as to how Gipson could engage in a performative show of trying to sign Employer-1, which Gipson could use to placate his bosses at Local 200:

CAHILL:  Here's what you do.  Send a certified letter to him.  I know you've been [U/I].  I want to sign you for [U/I].  **Send a letter.  Cover your ass.**  Get the letter.  If you want to respond it – you don't have to – but I would respond to it.  Say "look, I've had conversations with them, I'm in disagreement with the UA."  **Just send back and forth communications.  Simple communication that covers your ass with them.**

(Ex. H at 100.)  Making clear that the purpose of this endeavor was to deceive Local 638 and Local 200, Hill proposed that Employer-1 hire a few union members from Local 638 and Local 200 "just for show":

Hill:  Take two, and then take two . . . and that's it. . . . You know what I mean?  **Just for a show.**

---

[14]  Part of Gipson's statement—"I'm gonna have to have some fucking protection here.  Cause I'm gonna catch a lot of shit for this"—was not in the original draft transcript, but the Government has re-reviewed the recording and confirmed that this part of the statement by Gipson is audible.

[15]  "Tracks" is transcribed as "chops" in the original draft transcript, but the Government believes, based on re-reviewing the recording, that "tracks" is correct.  In any event, the difference is immaterial.

| Employer-1: | Of course.  Just so you know, **I really don't need you to give me guys, right?**  I mean, I got guys. |
|---|---|
| Hill: | **I know you don't.  I know you don't. . . . It's for show.** |
| Employer-1: | But you need to have the guys that keep their mouth shut. |

(Ex. H at 109–110.)  Employer-1 added: "Let's have the understanding that you're gonna leave me the fuck alone and not be embarrassed.  No one is getting embarrassed."  (Ex. H at 112–13.)

Cahill punctuated the conversation with: "I think you guys are gonna be able to [U/I] **cover. . . I'm good—I'm good at that: cover.**"  (Ex. H at 129–30.)[16]  Cahill, Hill, and Gipson each accepted cash bribes related to this meeting.

### e.   Cahill Indirectly Corrupts Matthew Norton, Jeremy Sheeran, and Andrew McKeon

Cahill did not attend in-person bribe meetings involving the other defendants, Matthew Norton, Jeremy ("Max") Sheeran, and Andrew McKeon.[17]  However, each of those Local 638 officials agreed to meet Employer-1 because they understood—often through Hill and Kraft—that Cahill either wanted or permitted such meetings to occur, and Cahill's influence loomed over the meetings.  Specifically:

Norton initially met with Employer-1, with Hill and Kraft both present, on June 14, 2019.  During that meeting Employer-1 explained to Norton: "I got some work in your area coming up.  I'm bidding a bunch of work, you know, **with—my friends here with Jimmy [Cahill] and all that shit.** . . . So I'm just – I just lay it out and talk.  Is that cool?"  Norton responded: "Okay.  Yeah, that's – abso-fucking-lutely."  Norton discussed projects with Employer-1 and accepted a $2,000 cash bribe at the meeting.  (Norton PSR ¶ 13.)

Sheeran initially met with Employer-1, with Hill present, on November 12, 2019.  Outside of Sheeran's presence, Hill assured Employer-1 that Sheeran was "solid," "one hundred percent with us" because "**Jimmy knows the fucking guy.**"  Once the meeting with Sheeran began,

---

[16]   The final instance of the word "cover" is marked "U/I" in the original draft transcript, but the Government has confirmed, by re-reviewing the recording, that Cahill again used the word "cover."

[17]   The only conspirator whom Cahill actively dissuaded Employer-1 from bribing was Kevin McCarron.  For example, on November 4, 2019, Cahill told Employer-1 on a recorded call "I told you stay away from that fucking McCarron."  When Employer-1 mentioned at a later meeting, in February 2020, that he had been trying to meet with McCarron, Cahill reiterated "Don't meet him."  Even so, Cahill's name meant something to McCarron.  When Employer-1 met McCarron to pay a bribe on August 30, 2019, McCarron described his view of Cahill thus: "What I love about Jimmy—what I fucking love about Jimmy, and I say this to everybody.  He takes care of his friends."

Sheeran confirmed that Cahill's imprimatur was a prerequisite for the meeting: "**Jimmy's telling me a lot** . . . Pat already told, Pat told me to . . . the **first thing I said is, you clear this with Jimmy?**"  At this meeting, Employer-1 discussed a project in Sheeran's jurisdiction and Sheeran accepted a $1,500 cash bribe.  (Sheeran PSR ¶¶ 16–18.)

McKeon initially met with Employer-1, with Hill and Kraft present, on September 19, 2019.  Outside of McKeon's presence, Hill told Employer-1 that Cahill had told Hill to bring McKeon to Employer-1: "**Jimmy told me, bring the kid around.**  Bring him around with us."  Employer-1 expressed some misgivings as to whether McKeon could be trusted to keep quiet about being bribed.  Hill again assured Employer-1: "Jimmy said keep him around.  I said okay."  When Employer-1 met McKeon, Employer-1 invoked the relationship with Cahill: "**I've been with Jimmy Cahill for the best part of 20 years now.  He's been my guy, okay?**  In this business, he's been my guy for all that. . . . You can check me out with Jimmy, he'll tell you that, you know?"  McKeon responded: "We'll figure it out."  At this meeting, McKeon spoke to Employer-1 about a potential project and accepted a $1,500 cash bribe.  (McKeon PSR ¶ 13; Ex. I (draft transcript of September 19, 2019 meeting) at 5, 9.)

### f.  Cahill's Receipt of Bribes During the Investigation

The meetings described above represent only a fraction of the bribes that Cahill accepted. During the investigation, Cahill accepted cash bribes from Employer-1 on 21 separate occasions, and total amount of those bribes was approximately $51,000.  The individual cash bribes ranged in amounts from $1,000 to $3,000.  (PSR ¶ 24.)[18]  Cahill typically accepted these bribes at sumptuous meals—involving wine, steak, and seafood—paid for by Employer-1.

In addition to receiving cash bribes, Cahill also demanded that Employer-1 furnish benefits in the form of free goods and services.  Specifically, Cahill repeatedly directed Employer-1 purchase and install a brand-name (Insinkerator) garbage disposal device and an ice machine at Cahill's home.  For example, on May 15, 2020, Cahill sent Employer-1 a photograph of the ice machine that Cahill wanted, stating "**Take this with you in case you fucking forget.**  I'm waiting two fucking summers."  (PSR ¶ 23.)  Shortly before the August 19, 2020 meeting with Gipson described above, Cahill complained to Hill about Employer-1's delay: "I said [to Employer-1] '**I'm not really talking to you until you fuckin' fix my fuckin' Insinkerator, you prick**.'" (Ex. J (excerpt of wiretap application quoting August 17, 2020 call) at 52.)  Cahill received the ice machine on June 12, 2020 and the Insinkerator device on September 9, 2020.

When Cahill was arrested, law enforcement seized $200,000 cash from a deposit box in his name.  As part of the Plea Agreement, Cahill stipulated that he possessed criminally forfeitable assets in the amount of $249,000, including the cash that was recovered.

---

[18]  The Government mistakenly omitted two cash bribes from the chart provided to the Probation Office.  The additional bribes are: (i) on February 10, 2020, Cahill accepted $2,500 cash at Blackstone and (ii) on September 30, 2020, Cahill accepted $1,000 cash at Park Side.  The Government also notes that the cash bribe Cahill accepted on August 19, 2020 was $2,000, not $1,000, as currently stated in the PSR.  The Government respectfully requests that the bribe chart at paragraph 24 of the PSR be revised to reflect these corrections.

### B.  Other Conduct: Cahill's Self-Professed Ties to Organized Crime

In the course of the investigation, Cahill told others about his ties with organized crime figures, including Mileta ("Michael Michael") Miljanic, a member of the Serbian organized crime syndicate Grupo Amerika, and Louis Filippelli, a caporegime in the Gambino Crime Family.[19]

At a March 13, 2020 bribe meeting with Employer-1, Cahill described his organized crime ties:

> CAHILL:  John [Gotti][20] was like this [crossing fingers] with my brother.  My brother and this guy Bosko.  This was his crew, you know, it's his Irish crew . . . Bosko's understudy is Michael Michael.

(Ex. F. at 28–29.)  Based on the Government's investigation: (i) "Bosko" referred to Bosko Radonjic, a Serbian organized crime figure who led the Westies street gang, (ii) Cahill's brother, Michael ("Mickey") Cahill, was a member of the Westies, and (iii) "Michael Michael" referred to Mileta Miljanic.

Later in the discussion, Cahill described his on-going relationships with both Miljanic and "Louis"—that is, Louis Filippelli ("Louis is in play now.  And Louis was very tight with my brother Mickey who was tight with Michael.").  (Ex. F. at 35.)  Cahill described Miljanic as "**my guy**," a member of "a mass murdering crew," and someone "they're all scared of."  (Ex. F. at 37–38.)  Cahill also told Employer-1 about his connections with Andrew Campos, another caporegime in the Gambino Crime Family ("Andrew was, he's like the top guy now.  And he just got pinched with the kickbacks.  Remember seeing it in the papers?  If you wanted a job, you had to give a kickback." "I'm close with Andrew." "So Andrew has this guy, Louis, and then they brought in Michael Michael.").[21]  (Ex. F. at 37–38.)  This was not empty braggadocio.  During the investigation, law enforcement surveilled Cahill meeting with Miljanic and Filippelli and he was

---

[19]  Miljanic recently pleaded guilty in the Southern District of New York to two counts of fraud and two counts of tax evasion in United States v. Miljanic, 22 Cr. 318 (PMH), and is scheduled to be sentenced.  He also recently finished serving a sentence from the Eastern District of New York for being a felon in possession of a firearm in United States v. Miljanic, 21 Cr. 191 (RP).

Filippelli was convicted in or about 2006 in the Southern District of New York of racketeering and extortion and was sentenced to 46 months' imprisonment and was convicted in or about 2008 in the Eastern District of New York of extortion and was sentenced to an additional five months' imprisonment.

[20]  Later in the conversation, Cahill confirmed that "John" referred to John Gotti, the Former Boss of the Gambino Crime Family.

[21]  Campos was convicted in January 2021 in the Eastern District of New York of racketeering conspiracy, and sentenced to 37 months' imprisonment.  Campos was also convicted in March 2005 in the Eastern District of New York of wire fraud conspiracy and sentenced to 21 months' imprisonment.

also intercepted on wiretaps speaking with both men.  Similarly, Cahill was surveilled meeting with Campos.[22]

Cahill also made clear that his associations with these men were on-going and that he had the authority to intervene in their activities.  For example, he recounted to Employer-1 an incident in which violence nearly arose between Cahill's nephew, Miljanic, and Filippelli, over a project:

> CAHILL:      Michael-Michael goes on his own, and he's complaining about my nephew.
>
> Employer-1:  Right. Who's he complaining to? To you?
>
> CAHILL:      To me and to Louis.  Then he goes into the crane business.  So, I go meet Louis.  He says, you know, your nephew—I said, whoa stop right there. I said, stop right there.  You're gonna continue this conversation, my nephew gets fucking complete [U/I].  **None of yous fucking bother him.  If you bother him, I'm gonna go away from yous, I won't talk to yous, I'm done.**

(Ex. F. at 39.)

## II.      Guilty Plea and Applicable Guidelines Range

On October 1, 2020, a federal grand jury returned an Indictment charging the defendant and ten other union officials in three counts.  The defendant was charged in Count One with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), in Count Two with honest services fraud conspiracy, in violation of 18 U.S.C. §§ 1343, 1346, and 1349, and in Count Three with conspiracy to violate the Taft-Hartley Act, in violation of 18 U.S.C. § 371.

On December 6, 2022, pursuant to a plea agreement (the "Plea Agreement"), the defendant pleaded guilty to the honest services fraud conspiracy offense charged in Count Two of the Indictment.

In the Plea Agreement, the parties stipulated that the total offense level under the Sentencing Guidelines for Count Two is 20, calculated as follows:

---

[22]   Specifically, on or about January 22, 2019, a call was intercepted between Cahill and Miljanic, during which Miljanic told Cahill: "I think, the other guy he like to see you.  Next week, Andrew."  The following week, on January 30, law enforcement surveilled Cahill entering a restaurant in Scarsdale, New York and sitting with an individual identified to be Campos.  The men spoke briefly and Cahill returned to his vehicle, where he was observed removing a white envelope from the breast pocket of overcoat that he subsequently placed it into the console area of his vehicle.  A short time later, Filippelli arrived and entered the restaurant.  Cahill, Campos, and Filippelli were surveilled meeting again in May 2019.

- The November 1, 2021 edition of the Guidelines Manual is applicable to the offense charged in Count Two.

- The Guideline applicable to the offense charged in Count Two is U.S.S.G. § 2B1.1.

- Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7.

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(F), 10 levels are added because the loss amount was more than $150,000 but less than $250,000.

- Pursuant to U.S.S.G. § 3B1.3, 2 levels are added because the defendant abused a position of public or private trust.

- Pursuant to U.S.S.G. § 3B1.1(a), because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, 4 levels are added.

- Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

The parties also stipulated that the defendant has zero criminal history points and is in Criminal History Category I. Based on the foregoing, the parties agreed that the Stipulated Guidelines Range is 33 to 41 months' imprisonment.

In footnote 1 of the Plea Agreement, the parties agreed that the offense level—and therefore the Guidelines range—did not take into account the following undisputed facts:

(a) In the years prior to the charged conspiracy, the defendant, while a union official, accepted cash bribes from [Employer-1];

(b) During this time, the defendant and [Employer-1] met periodically and with some frequency over a period of years, and [Employer-1] often made payments to the defendant at these meetings, in a sum totaling at least $100,000; and

(c) In exchange for the bribes, the defendant took action, in his capacity as a union official, to assist [Employer-1], including by authorizing the union to enter into job-specific labor agreements with [Employer-1].

(Plea Agreement at 2 n.1.)  The Plea Agreement provided that "either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a)."  (Id. at 4.)

In the Plea Agreement, Cahill agreed to forfeit $249,000 as criminal proceeds traceable to Count Two of the Indictment, including the $200,000 in cash found in his safe deposit box.  (Id. at 1–2.)

Cahill is the last defendant to be sentenced.  The other defendants have received the following sentences:

On December 6, 2022, Scott Roche was sentenced to two years' probation.

On December 12, 2022, Christopher Kraft was sentenced to 18 months' imprisonment.

On December 13, 2022, Matthew Norton was sentenced to three years' probation, including 9 months' home confinement.

On December 19, 2022, Patrick Hill was sentenced to 27 months' imprisonment.

On February 8, 2023, Jeremy Sheeran was sentenced to two years' probation.

On March 14, 2023, Robert Egan was sentenced to three years' probation.

On March 14, 2023, Andrew McKeon was sentenced to two years' probation.

On April 12, 2023, William Brian Wangerman was sentenced to four years' probation, including 6 months' home confinement.

On May 3, 2023, Arthur Gipson was sentenced to 60 days' imprisonment.

On May 10, 2023, Kevin McCarron was sentenced to 60 days' imprisonment.

On February 1, 2023, the Court docketed an Order advising the parties of the possibility that the Court would impose an above-Guidelines sentence on Cahill.  (Doc. No. 392.)  The Probation Office recommends that Cahill be sentenced to an above-Guidelines term of 48 months' imprisonment.

## III.   Cahill's PSR Objections

Cahill lodged approximately twenty pages of objections to the PSR, which he has reproduced in full, with additional commentary, in his sentencing submission.  (See Def. Sub'n at 29–57.)  None of those objections challenge the calculation of the Guidelines in the Plea Agreement and the PSR.  Nor do the majority of the objections challenge the accuracy of the facts set forth in the PSR, which consist almost entirely of excerpts from recordings made in the case.

Cahill's objections may be summarized—and rejected—as follows.

First, Cahill requests the inclusion of numerous additional excerpts from the wiretap and consensual recordings. As the Government's responses to the Probation Office make clear, the Government did not oppose the inclusion of any additional excerpts that Probation Office viewed to be fair context for the offense conduct. There is no material dispute of fact as what was said at meetings or calls. At the same time, the investigation involved dozens of hours-long recorded meetings, not to mention thousands of intercepted calls. The Probation Office was entitled to exercise its judgment as to what was relevant to include and what was not.

The Government notes that, under 18 U.S.C. § 3661, there is no limitation to the relevant materials that the Court may consider in connection with sentencing. Thus, even if a particular quotation or transcript was omitted from the PSR, the Court may consider it if it is material to sentencing and not disputed. United States v. Santiago, 330 F. App'x 234, 237 (2d Cir. 2009). Cahill has now put the quotations he wishes the Court to consider in his sentencing submission. The Government does not dispute the accuracy of any of those quotations, although the Government disagrees with many of the inferences Cahill asks the Court to draw. Likewise, the Government's sentencing submission includes transcript and quotation citations that were not originally in the PSR, on which the Court may similarly rely.

Second, Cahill's objections include editorial observations unconnected to specific requests for revisions. For example, with respect to paragraph 30, Cahill offers this commentary:

> "Cahill concedes that there was a discussion about Employer-1 holding himself out falsely as being affiliated with, though not necessarily signed with, the union to [Developer-1] and the other builder/contractor [Developer-2] and that this was improper. However, the context here is again critical. . . ."

(Def. Sub'n at 49.) The Probation Office was not required to provide space in the PSR for Cahill to engage in defense advocacy. Cahill has submitted a sentencing memorandum which advances every argument he wishes to make. Those arguments are now before the Court and need not be inserted in the PSR.

Third, some of Cahill's objections request the inclusion of facts that the Government does not dispute, but views to be irrelevant. For example, Cahill's objections to paragraphs 15 and 16 request the inclusion of language about the culpability of Employer-1. (Def Sub'n at 29.) The Court has already stated—most recently in connection with the sentencing of Kevin McCarron—that the Court does not view Employer-1's culpability or criminal history to be relevant to the application of the 18 U.S.C. § 3553(a) to the convicted defendants. The Government agrees.

Fourth, Cahill challenges some facts set forth in the PSR that are supported by more than sufficient evidence. Specifically:

<u>Paragraph 18.</u>  Cahill challenges the statement "Cahill wielded enormous influence and power over union officials at Local 638, including many of his codefendants . . ."  This statement is supported by the transcript citations already discussed above.

With respect to his control over Local 638 elections, Cahill protests that his "election involvement [in Local 638 politics] did not exceed . . . traditional practices and . . . his influence was not remarkable." (Def. Sub'n at 33.)  That is nonsense.

For example, during the March 13, 2020 meeting with Employer-1, Cahill described his ability to direct Scott Roche to assign a desirable jurisdiction to Patrick Hill so Hill (a Cahill loyalist) could provide personal benefits to Cahill:

> CAHILL:  **He got elected cause we all backed him.**  He never had a fuckin' position with the Local.  He was a fuckin' minor position, but he took a shot. We told him take a shot we'll get you the votes. So we got him the votes he got elected.  And they gave him a good area . . .
>
> **I went to Scott Roche, I says I want you to do me a favor.** Belmont wasn't in his area. . . .  But anyway, I says Scott, do yourself a favor, **give Paddy Hill the whole fuckin thing.**
>
> So now I said Paddy you got . . . **Don't embarrass me,** I don't care I want a few people hired whatever you got to do.  **I want my nephews hired which he'll do**

(Ex. F at 31–32.)  That Cahill views his brazen abuse of power to be "traditional" and "not remarkable" is telling.

<u>Paragraph 19.</u>   Cahill challenges language describing his pre-2018 <u>quid pro quo</u> relationship with Employer-1 that is essentially identical to the language the parties agreed to in the Plea Agreement.  Pointing to 2008 deposition testimony from Employer-1, Cahill wants the PSR to state that the <u>quo</u> he provided—labor peace agreements—were actually beneficial to the union and union members.

But Employer-1—who was a bona fide briber and not a confidential source in 2008—had every incentive to lie to protect himself and Cahill during that deposition.  Indeed, Employer-1 has told the Government, in sum and substance, that he lied during the deposition to protect himself and Cahill, in part at Cahill's request.  Moreover, it defies logic to believe that Employer-1 paid Cahill at least $100,000 in bribes to induce Cahill to provide a <u>quo</u> that Cahill would have readily provided for free.

<u>Paragraph 21.</u>  Cahill disputes that he knew that Hill and the other Business Agents would accept cash bribes from Employer-1.  There is overwhelming evidence that Cahill not only knew Employer-1 was bribing Hill and the other conspirators but facilitated, guided, and encouraged it.  For example:

- During the initial October 22, 2018 meeting with Kraft, Employer-1 complained to Cahill (after Kraft left) that Kraft was not worth bribing because Kraft did not have control over the relevant geographical area: "If it ain't his area, I'm not gonna fuckin' do nothing with this guy.  What am I going to do that for?  **Waste my money.**" (Ex. A. at 38.)

- During the initial December 19, 2018 meeting with Hill, Employer-1 bribed Cahill and then told Cahill that he would be bribing Hill too ("**I'm going to do something for him too.**").  Afterward, Cahill called Hill and congratulated him: "Welcome to the real world."  (Ex. C at 4.)

- During the November 14, 2018 meeting with Egan, Employer-1 bribed Cahill alone in the bathroom and then told Cahill he needed a moment to also bribe Egan: "So let me go out first with him.  **I'll sit with him and do my thing, alright?**" (Egan PSR ¶ 18.)

- During the March 13, 2020 meeting with Employer-1, Cahill advised Employer-1 not to waste bribe money: "But here's what I'd do.  I respect you, and I respect your money.  **I don't want you to be giving your fucking money away to nobody who can't do anything for you.  He cannot do a fucking thing for you.**" (Ex. F. at 49.)

<u>Paragraphs 22, 27, 29–32, 34.</u>  In a group of related objections, Cahill asserts that: (i) he never promised to help Employer-1 bid non-union jobs on potential union job sites and (ii) he sincerely urged Employer-1 to sign agreements with the unions because he wanted to benefit union members.

Again, the evidence clearly demonstrates otherwise.  At meeting after meeting, Employer-1 made clear to Cahill that he wanted to hold himself out as a union contractor (and therefore getting credit with developers) *without* having to hire union workers or pay union rates.  Cahill readily agreed to this plan.

For example, after Kraft left the October 22, 2018 meeting, Cahill and Employer-1 spoke about Employer-1's true wishes:

> Employer-1:   Listen, here's what I want.  **I want to not have to sign with anyone and be able to use everyone's name.**
>
> CAHILL:   **I don't blame you.**

(Ex. A at 39.)  Likewise, before Hill arrived at the December 19, 2018 meeting, Cahill confirmed with Employer-1 that any talk of signing with the union was for show only:

> CAHILL:   You've got to tell me if you really want to sign or you don't want to sign.

Employer-1:    **I don't want to sign.**  I want to keep doing what I'm doing.

(Ex. C at 2.)  At the August 19, 2020 meeting involving Cahill, Hill, Gipson, and Employer-1, Cahill *coached Gipson* on how to deceive Local 200—that is, how to give the false impression that Gipson was pressing Employer-1 to sign with the union when in fact Gipson was acquiescing to Employer-1 remaining a non-union contractor:

CAHILL:    Here's what you do.  Send a certified letter to him.  I know you've been [U/I].  I want to sign you for [U/I].  **Send a letter.  Cover your ass.**  Get the letter.  If you want to respond it – you don't have to – but I would respond to it.  Say "look, I've had conversations with them, I'm in disagreement with the UA."  **Just send back and forth communications.  Simple communication that covers your ass with them.**

(Ex. H at 100.)  At that same meeting, Hill proposed hiring a few Local 638 and Local 200 workers on the project, *not* to benefit those union members, but to provide a veneer of plausibility to Employer-1's claim of being pro-union: "Take two, and then take two . . . and that's it. . . . You know what I mean?  Just for a show."  (Ex. H at 109–110.)

Cahill was fully on board.  As he remarked later in the same meeting, "**I'm good—I'm good at that: cover.**"  (Ex. H at 129–30.)

\*    \*    \*

For the reasons set forth above, Cahill's pending objections to the PSR are meritless.[23]

## IV.    Discussion

### A.    Applicable Law

While advisory following United States v. Booker, 543 U.S. 220 (2005), the Sentencing Guidelines remain "the starting point and the initial benchmark" for sentencing proceedings.  Gall v. United States, 552 U.S. 38, 49 (2007).  However, a sentencing court may conclude that the advisory Guidelines range insufficiently reflects either the seriousness of the offense, or the history and characteristics of the defendant, or both.  See, e.g., United States v. Zukerman, 897 F.3d 423, 428 (2d Cir. 2018) ("[T]he district court was not bound to conclude that the offense level adequately accounted for the complexity and scope of Zukerman's actions.").

---

[23]   The defense submission includes a litany of "objections" to comments made by counsel and the Court at sentencings of other defendants.  (Def. Sub'n at 57–66.)  These objections are moot because the Government's position and arguments as to Cahill's sentence rely entirely on direct evidence of Cahill's own misconduct (which includes recordings and transcripts cited in other PSRs and sentencing proceedings).  Remarks of counsel, on the other hand, are never evidence, and the Government is not asking the Court to consider them in any way here.

In imposing a sentence, the Court must consider the factors set forth at 18 U.S.C. § 3553(a), which include the "the nature and circumstances of the offense and the history and characteristics of the defendant," id. § 3553(a)(1), and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," id. § 3553(a)(6). The factors also include the "need for the sentence imposed"

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;

> (C) to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Id. § 3553(a)(2).

### B.      The Court Should Impose a Sentence of At Least 60 Months' Imprisonment

James Cahill is in a class all by himself.  His conduct was the most egregious, his motives the most venal, and his betrayal of organized labor the most damaging.  In a span of just 22 months, he almost singlehandedly corrupted a generation of newly elected Local 638 Business Agents and other officials and, in the process, destroyed the reputation of a 100-year-old union and upended the livelihoods of its thousands of members.  He sold out union members for the basest of reasons—greed and lust for power—while enjoying public accolades for being a warrior for the labor cause.

The sentence imposed on Cahill must reflect these realities.  The Government respectfully submits that a sentence of 60 months' imprisonment is the lowest justifiable sentence under the 18 U.S.C. § 3553(a) factors.

*   *   *

A consistent theme across the victim impact statements that have been submitted to the Court is betrayal:

> I sat on many job sites and outside of meetings where they would shake your hand and tell you about all the moves they were making to better the local.  To shore up work so our members could live comfortable middle class blue collar lives.  They would send campaign mailers to my home listing all of the reasons they were qualified for positions of trust and authority within the local.  I voted for nearly all of the(m). . .

> They are all highly experienced and efficient operators both professionally and politically.  They knew full well what they were doing, why they were doing it and who would benefit most when their conspiracy succeeded.  The crimes they admitted to betrayed thousands of members and harmed their chance at prosperity.

Their game was to watch the local fall and assure that when it did they would be the ones to prosper.

(Doc. No. 355 (Victim Impact Statement of Jayson Gleason, Jr.).)

I'm writing this email with conflicting feelings in regard to our elected officials. I have known all of them for my entire career. I have worked side by side with them. We have celebrated together and wept together throughout the years. It saddens me to know these individuals choose to take the side of our competition rather than the members which they were elected and generously paid to support. The damage caused by these individuals has adversely affected this membership and many more to come in the future.

(Doc. No. 357 (Victim Impact Statement of Robert Durante).)

Just as members of the public place their trust in elected officials, members of labor unions place their trust—and the financial wellbeing of themselves and their families—into the hands of union officials whom they trust to negotiate honestly and faithfully on their behalf. Union officials are responsible for negotiating agreements that cover not only members' wages and benefits, but also workplace safety. Union officials are responsible for advocating for projects and policies that lead to the continued employment of union members. And union officials at the very top of the hierarchy—like James Cahill—have an even broader responsibility: to be the face of organized labor to the public.

A union official cannot perform those vital functions while simultaneously taking benefits, much less cash bribes, from someone whose interests are contrary to the union and with whom the official is supposed to be negotiating at arm's length. The problem of union corruption has a long history and remains all too prevalent, to the continuing detriment of unionized workers. See, e.g., Neal Boudette, United Auto Workers Seek to Shed a Legacy of Corruption, New York Times (July 31, 2022), available at https://www.nytimes.com/2022/07/31/business/uaw-autoworkers-union-corruption.html; Dirty Money: Report Shows Union Corruption Still Widespread, The National Law Review (Jan. 10, 2018), available at https://www.natlawreview.com/article/dirty-money-report-shows-union-corruption-still-widespread.

Union corruption does not emerge from nowhere. It is the handiwork of faithless servants like James Cahill, for whom power and trust are tools for personal gain. And once corruption takes hold, it spreads. In this case, Cahill personally corrupted many of his codefendants, and the widespread knowledge that he condoned Employer-1's bribes corrupted the rest. The Trustee for Local 638, who has submitted a victim impact statement on behalf of the union, makes this point well:

Mr. Cahill was not an officer of Local 638 during the period covered by the criminal charges in this case, but it is evident from the record that Mr. Cahill was at the center of the events described in the indictment and played a role in influencing at least some, if not all, of the Local 638 officer defendants into committing criminal acts (for which they have been appropriately held responsible).

> In sentencing Mr. Cahill, I would ask Your Honor to consider that Mr. Cahill engaged in conduct that caused a period of instability, uncertainty, and significant reputational damage for Local 638.

(Doc. No. 449 (Victim Impact Statement of Michael Mulvaney, Trustee of Local 638).)  Labor corruption not only harms unions from a practical standpoint—for example, by undermining their bargaining position in the future—it sows deep cynicism about the cause of organized labor itself. As the Trade Council, which Cahill used to lead, wrote in its victim impact statement:

> Mr. Cahill's crimes most certainly impact the NYS BCTC and the 200,000 construction workers it represents.  Mr. Cahill's crimes worked in direct conflict with the mission of the NYS BCTC . . . By accepting bribes and illegal cash payments from non-union contractors in exchange for favorable treatment of those contractors, Mr. Cahill directly undermined the work of the BCTC that he was elected to represent at the highest levels of our state and federal government.

> Mr. Cahill not only exploited the power of his position in the NYS BCTC for his own personal gain, but he also brought on disrepute and disrespect for all hard working labor leaders that work lawfully, tirelessly, and unselfishly on behalf of working men and women.

(Doc. No. 449 (Victim Impact Statement of Gary LaBarbera, President, Trades Council).)

Cahill's actions in this case were not the product of momentary weakness, lapse of judgment, or financial need.  At the time Cahill sold out the union members he represented, he sat atop the pinnacle of the organized labor, enjoyed the friendship of powerful politicians, and earned a comfortable living.

Yet he pocketed cash bribes **21 times**, over the course of approximately two years, and enriched himself in the amount of $51,000.  He suffered no illusions about who Employer-1 was or what Employer-1 wanted from him: after all, they had previously had a corrupt quid pro quo relationship involving at least $100,000 in additional cash bribes.

Cahill availed himself of Employer-1's payments without a hint of embarrassment or shame.  Indeed, he conducted himself with an air of entitlement and was outraged when he did not readily get the personal benefits he expected (e.g., bragging to Hill "I said [to Employer-1] 'I'm not really talking to you until you fuckin' fix my fuckin' Insinkerator, you prick.'").  Asserting dominance over others was Cahill's stock and trade.

For all of the above reasons, Cahill deserves a very significant prison sentence.  A sentence within the Stipulated Guidelines Range of 33 to 41 months' imprisonment would be inadequate for at least three reasons.

First, the Stipulated Guidelines Range does not take into account the at least $100,000 in additional bribes that Cahill accepted from Employer-1 before the charged conspiracy.  That Cahill engaged in the charged bribery after previously having corrupted himself with the same briber bears on, among other things, the need for specific deterrence and general deterrence, the history

and characteristics of the defendant, and the need for just punishment.  The Government notes that, had the $100,000 been included in the Guidelines calculation, the offense level would have been two levels higher, resulting in an advisory range of 41 to 51 months' imprisonment.[24]  Thus, while the Stipulated Guidelines Range correctly calculates the Guidelines applicable to Cahill's commission of the conspiracy charged in Count Two, it does not fully capture Cahill's history of corrupt conduct.

Second, the offense-level enhancements understate Cahill's role in the charged conspiracy. Like every other defendant in the case—including, for example, Scott Roche—Cahill received a two-level enhancement for abuse-of-position.[25]  Plainly, the manner in which Cahill betrayed his position dwarfs that of his codefendants.

Cahill also received a four-point enhancement for being the leader and organizer of a criminal scheme that involved five or more participants.  U.S.S.G. § 3B1.1(a).  That enhancement embraces many different factual scenarios and does not account for a leader, like Cahill, who exercised extraordinary control over his subordinates.  Cahill not only recruited almost all of the coconspirators into the bribery scheme, he also personally dictated how many of them should help Employer-1.  For example, he told Hill, at the initial meeting with Employer-1 "In Nassau, you leave [Employer-1] alone."  He told Gipson, at the August 19, 2020 meeting: "This time you're gonna be out of the boat," meaning Gipson needed to leave Employer-1 alone.  He exercised nearly absolute control over Roche, who was nominally one of the highest-ranking officials in Local 638: "Roche don't want the job . . . He's just hiding from his responsibilities.  That makes us more powerful."  Indeed, Cahill exercised substantial influence over the very process through which some of his coconspirators assumed their union roles.  Cahill was a driving force behind Hill—a relative unknown at Local 638—being elected to be a Business Agent and being assigned a plum geographical location by Roche.

The four-level enhancement also does not take into account the fact that Cahill leveraged his reputation as someone connected with mobsters to inspire fear.  As the recordings make clear, Cahill's power stemmed not only from his union positions—e.g. his presidency of the Trades Council, and his former high-ranking positions within the UA and Local 638—but also the belief that he consorted with elements of organized crime, including figures like Miljanic, Filippelli, and Campos.

Third, the Guidelines nowhere account for Cahill's preeminence in the labor world and his connections to the highest echelons of government and commerce.  Cahill's stature is relevant to

---

[24]  To be clear, the Government remains of the view that the $100,000 in pre-2018 bribes were properly excluded from the Guidelines calculation because they preceded, and were unrelated to, the charged conspiracy.

[25]  In the case of defendants (like Roche) who pleaded to Taft Hartley offenses, the enhancement applied under U.S.S.G. § 2E5.1(b)(1).  In the case of defendants (like Cahill, Hill, and Kraft) who pleaded guilty to honest services fraud conspiracy, the enhancement applied under U.S.S.G. § 3B1.3.

several § 3553(a) factors, including the seriousness of the offense, the need for just punishment, and the need for general deterrence.

Stature amplifies hypocrisy. Yearslong corruption by a leader as visible as Cahill creates more cynicism and inflicts much greater harm than misconduct by an ordinary union official. Moreover, by virtue of Cahill's policymaking clout and his role at the Trades Council, his crime affected union members beyond the members of Local 638 and Local 200. For those same reasons, the public and members of the labor community will follow Cahill's sentence much more closely than the sentences of the other defendants, leading to a much greater potential deterrence effect. It is important that the Court's sentence make clear that no one—not even someone as firmly ensconced in the corridors of power as James Cahill—is above the law.

## IV.   **Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of at least 60 months' imprisonment. Such a sentence would be sufficient but not greater than necessary to serve the purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

by:   /s/_____
Jason Swergold / Danielle Sassoon / Jun Xiang /
Frank J. Balsamello / Marguerite Colson
Assistant United States Attorneys
Laura de Oliveira, Special Assistant United States
Attorney

**CC (BY ECF)**
Sanford Talkin, Esq.
Noam Greenspan, Esq.